Peter L. Haviland (Bar Number 144967)
havilandp@ballardspahr.com
Scott S. Humphreys (Bar Number 298021)
humphreyss@ballardspahr.com
Terrence M. Jones (Bar Number 256603)
jonestm@ballardspahr.com
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909
Telephone: 424.204.4400
Facsimile: 424.204.4350

Attorneys for Plaintiff
Century of Progress Productions

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTURY OF PROGRESS PRODUCTIONS, <br><br> Plaintiff, <br><br> v. <br><br> VIVENDI S.A.; STUDIOCANAL; STUDIOCANAL IMAGE; RON HALPERN, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:16-cv-07733 <br><br> **COMPLAINT FOR:** <br><br> (1) Breach of Contract; <br> (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; <br> (3) Fraud; <br> (4) Accounting; and <br> (5) Declaratory Relief Re: Trademark (28 U.S.C. § 2201) <br><br> **DEMAND FOR JURY TRIAL** |

# PRELIMINARY STATEMENT

1. Harry Shearer, creator of the radio and podcast program "Le Show," and voice of some twenty-three characters on "The Simpsons," is co-creator of the movie classic *This Is Spinal Tap,* in which he performed as the musician Derek Smalls.

2. *This Is Spinal Tap* and its music, which Shearer also co-wrote, including such songs as "Sex Farm" and "Stonehenge," have remained popular for more than thirty years, and have earned considerable sums for the French conglomerate Vivendi S.A.

3. But not for its creators. Defendant Vivendi and its agents, including StudioCanal executive Ron Halpern, have engaged in anti-competitive business practices by manipulating accounting between Vivendi film and music subsidiaries and have engaged in fraud to deprive the Spinal Tap creators of a fair return for their work.

4. To address this fraud, Mr. Shearer through his company Century of Progress Productions ("CPP" or "Plaintiff") brings the present action seeking not less than one hundred twenty five million dollars ($125,000,000) in compensatory and punitive damages. Plaintiff is concurrently issuing notices of copyright termination and has filed trademark applications to secure creative rights. CPP seeks a judicial declaration vindicating those rights, which have been abandoned by Vivendi.

5. Since the movie's release in 1984, *This Is Spinal Tap* music, merchandise, classic phrases and images have become ubiquitous in popular culture. The movie itself had two theatrical releases and has been re-sold in a number of commercial formats. A series of companies has profited from merchandising, music, film, television and video rights. For many years, Vivendi and its subsidiaries, including Canal Plus, StudioCanal, StudioCanal Image and Universal Music Group ("Vivendi"), have claimed and administered many of these rights and have been responsible for accounting to the co-creators, including Plaintiff.

6. But according to Vivendi, the four creators' share of total worldwide merchandising income between 1984 and 2006 was $81 (eighty-one) dollars. Between 1989 and 2006 total income from music sales was $98 (ninety-eight) dollars. Over the past two years, Vivendi has failed to provide accounting statements at all.

7. Vivendi has engaged and is continuing to engage in anti-competitive and unfair business practices and has abandoned its obligations to enforce intellectual property rights in *This Is Spinal Tap,* unlawfully depriving Plaintiff of substantial revenues. Vivendi has also failed, and continues to fail, to account honestly for income actually received from *This Is Spinal Tap.*

## THE PARTIES

8. Plaintiff is a California corporation with its principal place of business in Sherman Oaks, California.

9. Defendant Vivendi S.A. ("Vivendi") is a French corporation headquartered in Paris, France, doing business in and engaging in acts affecting Plaintiff within this judicial district.

10. Defendant StudioCanal ("Canal") is a subsidiary of Vivendi, headquartered in Paris, France, doing business in and engaging in acts affecting Plaintiff within this judicial district.

11. Defendant StudioCanal Image, a French joint stock company and subsidiary of Vivendi, is the last listed owner for certain federal trademark registrations in the trademark SPINAL TAP which have been abandoned and cancelled by the United States Patent and Trademark Office.

12. Defendant Ron Halpern is an executive of Canal, resident in Paris, France, doing business in and engaging in acts directed at persons and entities within this judicial district.

13. Does 1 through 10 are persons and/or entities whose true names and capacities are unknown to Plaintiff and who participated in, conspired with, and/or

3
COMPLAINT AND DEMAND FOR JURY TRIAL

1 caused Defendants to engage in the fraud and breaches of contract as alleged herein
2 and who are otherwise responsible and liable to Plaintiff for the wrongful acts
3 alleged herein. Plaintiff will amend this Complaint to allege the true names and
4 capacities of said defendants as they become known.

## JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1338(a) because this action seeks declaratory judgment that Defendants lack rights to enforce abandoned trademarks under the Lanham Act, 15 U.S.C. § 1051 *et seq*.

16. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events that the claims are based upon occurred in this district.

17. Jurisdiction and venue are proper in this Court because Defendants, through their predecessor-in-interest Embassy Pictures, a California joint venture, contractually consented to submit to the jurisdiction of the District Court of the Central District of California.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Genesis and Success of "*This Is Spinal Tap*"

18. Christopher Guest ("Guest"), Michael McKean ("McKean") and Harry Shearer ("Shearer") first performed together live as Spinal Tap in a television show in the 1970's. They later, with Rob Reiner, developed the characters in the Spinal Tap band and made a short film with improvised scenes and seven songs. In the process of attempting to turn that short film into a feature-length movie, they formed a joint partnership, "Spinal Tap Productions" ("STP"). On the strength of this work, on May 7, 1982, Reiner, Shearer, Guest, and McKean, as co-owners of STP, signed an agreement (the "Agreement") with Embassy Pictures ("Embassy")

for production, financing, and distribution of the motion picture *This Is Spinal Tap* ("TIST" or "the Film").

19. Under the terms of the Agreement, STP and its principals Reiner, Shearer, Guest and McKean were to receive fixed, deferred and contingent compensation for their services in the form of profit participation payments based on all sources of revenue, including, without limitation, merchandise and music.

20. TIST was released in 1984. The renowned Chicago Sun film critic Roger Ebert described TIST as "absolutely inspired" in a 1984 review that well summarized the film's appeal:

> Rock musicians never die, they just fade away, and "This Is Spinal Tap" is a movie about a British rock group that is rocketing to the bottom of the charts. It also is one of the funniest, most intelligent, most original films of the year.
>
> The movie looks like a documentary filmed during the death throes of a British rock band named Spinal Tap. It is, in fact, a satire. The rock group does not really exist, but the best thing about this film is that it could. The music, the staging, the special effects, the backstage feuding and the pseudo-profound philosophizing are right out of a hundred other rock groups and a dozen other documentaries about rock.
>
> The group is in the middle of an American tour. The tour is not going well. Spinal Tap was once able to fill giant arenas, but its audiences have grown smaller and smaller, and concert dates are evaporating as the bad news gets around. No wonder. Spinal Tap is a bad rock 'n' roll band. It is derivative, obvious, phony and pretentious, and it surrounds itself with whatever images seem commercial at the moment (a giant death's head on stage, for one).
>
> The movie is absolutely inspired in the subtle way it establishes Spinal Tap's badness. The satire has a deft, wicked touch. Spinal Tap is not that much worse than, not that much different from, some successful rock bands. A few breaks here or there, a successful album, and they could be back in business. (Proof of that: A soundtrack album, "Smell the Glove," is getting lots of airplay with cuts like "Sex Farm").

21. TIST was quickly recognized as a unique film with long-term appeal, as shown in its later inclusion in "best ever" lists such as *The New York Times Guide to the Best 1,000 Movies Ever Made; Entertainment Weekly's 100 Greatest Movies of All Time* where it appeared on the "Just Too Beloved to Ignore" list; and the *100 Greatest Movies of All Time* list published by Total Film. Confirming TIST's strong international appeal and following, in 2011 *Time Out London* named the film number one on its list of The 100 Best Comedy Movies. In 2002, the National Film Registry of the Library of Congress designated TIST as a culturally, historically, or aesthetically significant film. TIST still enjoys popularity on television, home video, and other media, including a 25th Anniversary Blu-Ray DVD release in 2009.

22. TIST was produced on a shoestring budget of approximately $2.25 million dollars. On information and belief, TIST's enduring popularity has generated tens of millions of dollars in revenue in the thirty years since its original theatrical release.

### The Terms of the Original 1982 Production Agreement

23. The Agreement was drafted in several sections, including an eleven-page letter agreement with details of overall rights, personal services, and compensation; a one-page Exhibit A Instrument of Transfer; a 48-page Exhibit B Standard Terms and Conditions, a fourteen-page Exhibit 1 to Exhibit B Formula for Computing Net Receipts, and a four-page Exhibit 2, Standard Delivery Items. The Agreement is signed by Guest as President of STP, and includes Inducement Letters on behalf of their personal services corporations from Shearer (on behalf of Century of Progress Productions), Reiner (on behalf of Rob Reiner Productions), Guest (on behalf of himself), and McKean (on behalf of United Heathen).

24. Paragraph 12 of the Agreement acknowledges that STP "is entirely owned by Rob Reiner Productions, United Heathen, Century of Progress Productions and Christopher Guest."

25. The Agreement includes identification of the creative team's services as screenwriters and actors, and in the case of Reiner, additional directorial duties.

26. The Agreement specified various sums of fixed compensation for the creative team, as well as contingent compensation calling for a split of Net Receipts 60% to Embassy and 40% to STP (¶ 4a and 4b).

27. Under the Agreement, Embassy promises, *inter alia*, to send Earnings Statements to STP showing the calculation of Net Receipts, first on a monthly, then quarterly, and after approximately three years, on an annual basis. But Vivendi, Embassy's successor-in-interest, has breached and continues to breach these promises.

**Defendants' Acquisition of the Rights and Obligations in TIST, and Fraudulent Accounting**

28. The catalog of Embassy, including unsuccessful films "bundled" with TIST, was acquired several times in a succession of transactions including sales to the Coca Cola Company, Parafrance, a subsidiary of L'Oreal and the DeLaurentiis Entertainment Group, Inc. In or around 1989, predecessors of Vivendi's subsidiaries acquired pertinent TIST rights.

29. Vivendi is responsible for accounting under the Agreement. Some profit participation statements were historically submitted to STP, c/o Creative Artists Agency ("CAA"), Reiner's agent. Those profit participation statements, Plaintiff has recently discovered, reflect anti-competitive and unfair business practices in their cross-collateralization of revenues between different Vivendi subsidiaries; unfairly bundle and cross-collateralized unsuccessful films in the Embassy catalogue with TIST; were not delivered to other creators; and fraudulently underreported the revenues owed to Plaintiff and other members of STP. Over the last two years, Vivendi and Canal have failed to account at all on TIST revenues.

30. Revenue streams arising from the film, including sound recordings and music publishing, were also included in the Agreement. The soundtrack music rights are now claimed by entities including another subsidiary of Vivendi, the Universal Music Group, which has an obligation to report and pay Canal, which in turn has an obligation to report and pay Plaintiff pursuant to Defendants' accounting obligations. The accounting between the Vivendi subsidiaries is not at arm's-length, is anti-competitive, and deprives the TIST creators of a fair reward for their services. Particularly given that Vivendi has offset fraudulent accounting for revenues from music copyrights against equally dubious revenue streams for film and merchandising rights also controlled by Vivendi subsidiaries, Shearer is concurrently filing notices of copyright termination for publishing and recording rights in Spinal Tap songs he co-wrote and co-recorded, as well as in the film itself.

**Plaintiff Investigates Defendants' Accounting and
Discovers their Fraudulent Conduct**

31. In 2013, in anticipation of TIST's upcoming 30th Anniversary in 2014, Plaintiff commissioned a study of the accounting statements and revenue streams associated with TIST. Plaintiff learned the results of that study in or around November 2013.

32. Plaintiff then first discovered that Vivendi had engaged in a pattern of anti-competitive and unfair business practices, had abandoned enforcement of valuable TIST rights, and had willfully concealed and manipulated years of accountings to retain monies due and owing to Plaintiff.

33. Examples of Defendants' willful misconduct designed to deprive Plaintiff of the benefit of the promises made in the Agreement include but are not limited to:

- failure to remit statements and accountings, with gaps occurring in years that would have enhanced revenue;

- improper expense deductions;

- failure to account for monies received, including a 2004 settlement payment received from MGM Home Video totaling over $1.6 million dollars for underreported VHS and DVD revenues, when statements for the year 2004 were never submitted to Plaintiff by Defendants;

- undocumented marketing and promotion expenses allegedly incurred years after release totaling over $2.5 million dollars;

- undocumented charges to "Freight and other Direct Costs" totaling over $500,000 over several years, allegedly incurred almost *twenty* years after the film's initial release;

- failure to account for monies under the terms of the Agreement as "actually received by Embassy in the United States";

- failure to collect revenue on merchandise and for use of material protected by Spinal Tap trademarks and copyrights.

34. Ron Halpern, during his management of the exploitation of TIST, repeatedly assured TIST's manager at the time, Harriet Steinberg, that he and his staff were fully complying with the underlying Agreement, were providing accurate and reliable accountings to CPP, and were using all available means to promote Spinal Tap assets and enforce Spinal Tap intellectual property to maximize revenue for the Spinal Tap creators.  These statements were made directly to Ms. Steinberg, as well as to Harry Shearer.  Plaintiff reasonably relied on these assurances from Mr. Halpern.  But the statements by Ron Halpern were knowingly false when made.  Despite Plaintiff's reasonable diligence, Plaintiff was unaware until in or around November 2013 that Mr. Halpern, Vivendi and its subsidiaries had intentionally engaged in an extended and outrageous pattern of fraud and misconduct.

35. In advance of the theatrical re-release of the film in 2000, managed for Canal by Ron Halpern, Mr. Shearer was asked to fly to London to meet with Halpern.  During that meeting, a luncheon at the Groucho Club, Mr. Halpern informed Mr. Shearer that, in accord with Mr. Shearer's preferences to support

"indies" – independent, creative, entrepreneurial companies, the United Kingdom re-release rights were being assigned to a small "boutique" distributor, who would welcome Shearer's personal involvement in marketing and advertising advice for the re-release. Mr. Shearer responded by sharing ideas with Halpern at that meeting. When Shearer returned to Los Angeles, he learned that in fact the United Kingdom distributor was not an independent "boutique," but a subsidiary of Metro-Goldwyn-Mayer. Mr. Shearer knew then that Ron Halpern was mendacious. But Shearer never imagined, until his review of a report in or around November 2013, that Halpern was capable of the level of deception and willingness to subvert contractual obligations that characterized Halpern's mistreatment of *This Is Spinal Tap's* creators.

36. On information and belief, the conduct described here, including financial accounting, intellectual property and legal policies and practices of Canal and Universal Music Group, as well as the personal practices of Ron Halpern, are controlled and directed by Vivendi. Canal, Universal Music Group and Ron Halpern are both ostensible and actual agents for Vivendi, and Vivendi has liability for the acts of each of these agents.

### The SPINAL TAP Trademark

37. In 1984, Defendants' predecessor, Embassy, filed a trademark application with the United States Patent and Trademark Office (USPTO) for the mark SPINAL TAP. The federal registration for that mark was cancelled by the USPTO in 1991. In early 2000, Defendants' predecessors filed certain other federal trademark registration applications with the USPTO for the mark SPINAL TAP as shown in Exhibit 1 hereto. In or about March 2002, as shown in Exhibit 2 hereto, the rights to those marks were conveyed to Defendant StudioCanal Image, a Vivendi subsidiary, who is still identified by the USPTO as the last listed owner for those federal registrations.

38. Defendants subsequently abandoned, with no intent to resume, all rights to the SPINAL TAP marks, and the federal registrations for those marks were cancelled by the USPTO in 2011 and 2012 as shown in Exhibit 1 hereto. As additional evidence of such abandonment, Defendants did not oppose a trademark application filed on December 27, 2013 by Heretic Brewing Company to register the mark SPINAL TAP in connection with "beer" products, and that mark was registered by the USPTO on April 7, 2015 as shown in Exhibit 3 hereto.

39. Because the SPINAL TAP marks have been abandoned by Defendants, CPP has filed applications for federal registrations of the marks SPINAL TAP and DEREK SMALLS as set forth in Exhibits 4 through 7 hereto.

## COUNT I

## Breach of Contract

## (Against Vivendi and Canal)

40. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 39 above, as if fully set forth herein.

41. Defendants Vivendi and Canal, through their predecessor-in-interest Embassy entered into the May 7, 1982 Agreement with Spinal Tap Productions. Plaintiff was a party to that Agreement as acknowledged in Paragraph 12 of the Agreement and in the various provisions of the Agreement for Plaintiff's services, which granted rights to Plaintiff including fixed, deferred and contingent compensation.

42. At all times, Plaintiff performed its obligations under the Agreement.

43. Defendants have breached and are in continuing breach of their obligations under the Agreement by, *inter alia*, engaging in anti-competitive and unfair cross-collateralization between Vivendi subsidiaries; cross-collateralizing unsuccessful films bundled with TIST in their accounting; failing to remit accounting statements; failing to respond to enquiries and information requests; failing to keep accurate records; failing to include revenues in accounting

statements; claiming undocumented and false expenses as part of a fraudulent scheme to deprive Plaintiff of its contractual rights; and failing to diligently exploit available revenue streams.

44. Plaintiff has been and continues to be damaged by Defendants' illegal acts in amounts to be proven at trial.

## COUNT II

## Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Vivendi and Canal)

45. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 44 above, as if fully set forth herein.

46. The 1982 Agreement, governed by California law, contains an implied covenant of good faith and fair dealing. Defendants breached this implied covenant by their acts, including the anti-competitive and unfair business practices among Vivendi subsidiaries alleged herein.

47. Defendants have intentionally abused their power to frustrate Plaintiff's right to receive the benefit of the bargain made in the Agreement, in a manner that goes beyond mere breach of the Agreement, but as part of an intentional scheme abusing Defendants' discretionary power to deprive Plaintiff of the benefits contemplated in the Agreement.

48. Plaintiff has been damaged by Defendants' wrongful conduct in amounts to be proven at trial.

## COUNT III

## Fraud

### (Against Vivendi, Canal and Ron Halpern)

49. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 48 above, as if fully set forth herein.

50. Defendants, by and through Rob Halpern, repeatedly made statements to Plaintiff's agents that Mr. Halpern and his staff were fully complying with the

underlying Agreement, were providing accurate and reliable accountings to Plaintiff, and were using all available means to enforce Spinal Tap trademarks and copyrights and to maximize revenue for the Spinal Tap creators. These statements were knowingly false when made. Plaintiff reasonably relied on these statements.

51. Defendants' acts constitute intentional misrepresentation, deceit, and concealment of material facts known to the Defendants with the intention of unlawfully depriving Plaintiff of financial consideration due under the Agreement.

52. As a direct result of Defendants' intentional misrepresentations, Plaintiff was unaware of the true facts and did not discover Defendants' fraudulent accounting practices until approximately November 2013.

53. As a result of Defendants' fraud, Plaintiff has been damaged in amounts to be proven at trial.

54. Defendants' conduct was willful, wanton and oppressive, designed maliciously to steal from, deceive and injure Plaintiff. Plaintiff is entitled to an award of punitive damages to punish and deter this conduct.

### COUNT IV
### For an Accounting
### (Against Vivendi, Canal and Ron Halpern)

55. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 54 above, as if fully set forth herein.

56. Defendants were obligated to provide to Plaintiff statements accurately reflecting the amount of revenues derived from the distribution and exploitation of the Film and associated music and merchandise rights, and to remit to Plaintiff its share of revenues.

57. Despite demand therefor, Defendants have failed and refused, and continue to fail and refuse, to provide Plaintiff with proper and accurate accountings reflecting the amount of revenues derived from the distribution and exploitation of the Film and associated music and merchandise rights. Instead,

Defendants have intentionally provided false and fraudulent profit participation statements to Plaintiff.

58. The false and fraudulent profit participation statements submitted by Defendants are cumulative, and entitle Plaintiff to an accurate and truthful accounting showing how the current cumulative numbers were calculated.

59. Plaintiff is entitled to an order requiring Defendants to provide their complete books and records of account in all details.

## COUNT V

### Declaratory Judgment of Non-Infringement, 28 U.S.C. § 2201, *et seq.*
### (Against Vivendi, Canal and StudioCanal Image)

60. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 59 above, as if fully set forth herein.

61. In 1984, Defendants' predecessor-in-interest Embassy filed a trademark application with the United States Patent and Trademark Office (USPTO) for the mark SPINAL TAP in connection with entertainment services rendered by a musical group. The federal registration for that mark (Registration No. 1311537) was cancelled by the USPTO in 1991 as shown in Exhibit 1 hereto.

62. In early 2000, Defendants' predecessor-in-interest, Canal + D.A., a Vivendi subsidiary, filed certain trademark applications with the USPTO for the mark SPINAL TAP in connection with, *inter alia,* entertainment services in the nature of live musical performances by a group, videotape and film production of live musical performances, and certain merchandising associated with the mark as shown in Exhibit 1 hereto.

63. In or about March 2002, Canal + D.A. filed an instrument with the USPTO stating that it had merged with Defendant StudioCanal Image, a Vivendi subsidiary, and that it was conveying its rights to the applications and registrations for the SPINAL TAP marks to StudioCanal Image, as shown in Exhibit 2 hereto. StudioCanal Image is identified by the USPTO as the last listed owner for federal

registrations for those SPINAL TAP marks, now cancelled, Registration Nos. 2499728, 2463576, 2867023, 2881983 and 2881984.

64. Defendants subsequently abandoned the SPINAL TAP marks, resulting in the USPTO's cancellation of the federal registrations for those SPINAL TAP marks in 2011 and 2012 as shown in Exhibit 1 hereto. Defendants' abandonment of the SPINAL TAP marks is reflected by their discontinuation of use or enforcement of the marks in the ordinary course of trade for at least three consecutive years without intent to resume use.

65. Defendants' abandonment is further evidenced by the fact that Defendants' did not oppose an application filed on December 27, 2013 by Heretic Brewing Company to register the mark SPINAL TAP for use in connection with "beer" products, which mark was registered by the USPTO on April 7, 2015 (Registration No. 4717603) as shown in Exhibit 3 hereto.

66. Despite Defendants' abandonment of any trademarks rights related to *This Is Spinal Tap,* including in and to the mark SPINAL TAP, Defendants have sought selectively to claim rights to the marks against Plaintiff and other co-creators of the SPINAL TAP band, and have sought to prevent Plaintiff from performing or selling merchandise in association with the marks SPINAL TAP or DERRICK SMALLS unless Defendants grant a license and receive payment for such use.

67. Plaintiff, rejecting Defendants' claim of rights, has recently filed applications with the USPTO for federal registration of the marks SPINAL TAP and DEREK SMALLS -- which have been assigned serial numbers 87203893, 87203921, 87203942, and 87203958 -- for, *inter alia,* entertainment services in the nature of live music concerts and dramatic, comedic and musical performances and for certain merchandise as set forth in Exhibits 4 through 7 hereto.

68. A substantial controversy exists between the parties as to whether Plaintiff has the right to use and register the trademarks SPINAL TAP and DEREK SMALLS in connection with entertainment performances and merchandise. The

controversy has sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A judicial declaration is necessary and appropriate at this time in order that Plaintiff may ascertain its rights and duties with respect to the marks SPINAL TAP and DEREK SMALLS.

69. Plaintiff seeks declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, confirming that Plaintiff's use of the SPINAL TAP and DERREK SMALLS marks in connection with the services and goods set forth in its trademark applications does not infringe any abandoned trademark rights of Defendants.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order:

(a) Compelling Defendants to produce the original books and records of account and to satisfactorily and accurately account to Plaintiff with respect to all expenses and revenues for the film TIST, including associated music, merchandise and other revenues, and to disgorge the monies due to Plaintiff therefrom;

(b) Declaring that Plaintiff's registration and use of the SPINAL TAP and DEREK SMALLS marks in connection with the goods and services set forth in its trademark applications do not infringe on any abandoned trademark rights of Defendants;

(c) Awarding Plaintiff the following:
   (i) Compensatory and punitive damages in amounts to be determined at trial;
   (ii) Costs of suit;
   (iii) Reasonable attorneys' fees;
   (iv) Pre- and Post-Judgment Interest as allowed by law;

(d) Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable by right to a jury.

DATED: October 17, 2016         **BALLARD SPAHR LLP**


                                 */s/ Peter L. Haviland*
                                 Peter L. Haviland

                                 Attorneys for Plaintiff
                                 Century of Progress Productions