RUSS, AUGUST & KABAT
Stanton L. Stein (SBN 45997)
    lstein@raklaw.com
Bennett A. Bigman (SBN 115426)
    bbigman@raklaw.com
Irene Y. Lee (SBN 213625)
    ilee@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone:   (310) 826-7474
Facsimile:   (310) 826-6991

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTURY OF PROGRESS PRODUCTIONS; CHRISTOPHER GUEST; ROB REINER PRODUCTIONS; UNITED HEATHEN; SPINAL TAP PRODUCTIONS; HARRY SHEARER; ROB REINER; and MICHAEL MCKEAN,<br><br>                    Plaintiffs,<br><br>         v.<br><br>VIVENDI S.A.; STUDIOCANAL; RON HALPERN, an individual; UNIVERSAL MUSIC GROUP, INC.; UMG RECORDINGS, INC.; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No. 2:16-cv-07733-DMG-AS<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>(1)  Breach of Contract (1982 Agreement);<br>(2)  Breach of the Implied Covenant of Good Faith and Fair Dealing (1982 Agreement);<br>(3)  Breach of Contact (PolyGram Agreement)<br>(4)  Breach of the Implied Covenant of Good Faith and Fair Dealing (PolyGram Agreement)<br>(5)  Fraud by Concealment and Misrepresentation;<br>(6)  Accounting;<br>(7)  Declaratory Relief Re: Trademark Rights (28 U.S.C. § 2201); and<br>(8)  Declaratory Relief Re: Copyright Reversion (17 U.S.C. § 203)<br><br>**DEMAND FOR JURY TRIAL** |

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

# PRELIMINARY STATEMENT

1.      In this Third Amended Complaint, *This is Spinal Tap* co-creators Harry Shearer, Christopher Guest, Michael McKean and Rob Reiner, together with their loan-out companies and Spinal Tap Productions (collectively "Plaintiffs") hereby clarify and amplify their allegations in accordance with the guidelines in the Court's Order dated August 28, 2018. By their amendment, Plaintiffs state more clearly: (1) the basis for Universal Music Group's obligations to Plaintiffs as third party beneficiaries of the agreement between Universal Music Group's predecessor PolyGram Records and StudioCanal's predecessor Embassy Pictures with respect to the soundtrack album and other sound recordings from *This is Spinal Tap*; and (2) the nature of the fraudulent representations made by Universal Music Group that it knew and intended would be repeated to Plaintiffs, and were in fact relied on by Plaintiffs, which meet the necessary pleading requirements for alleging fraud based on indirect fraudulent misrepresentations.

Plaintiffs wish to conclude the pleading stage of this case so that they can finally conduct discovery into Defendants' fraudulent accounting practices and have the case adjudicated on its merits. It is time that Plaintiffs be permitted to determine the substantial amounts they are owed in connection with *This is Spinal Tap* and regain ownership of their intellectual property so they may finally receive the benefits of their iconic creative work.

## *This Is Spinal Tap* Is Not a "Work for Hire"

2.      Shortly after this lawsuit was first filed in October 2016, *Spinal Tap* co-creators Harry Shearer, Christopher Guest, Michael McKean and Rob Reiner exercised their rights to issue copyright termination notices pursuant to Section 203 of the 1976 Copyright Act to recapture all copyrights to the characters, sound recordings, and musical compositions that appeared in *This Is Spinal Tap*, including the screenplay and the film itself.  The termination notices were served, among others, on Vivendi subsidiaries StudioCanal and Universal Music Group.

3.      In response Vivendi, in its February 28, 2017 motion to dismiss the co-creators' First Amended Complaint, threatened to file a lawsuit against Harry Shearer and to seek recovery of its attorneys' fees purportedly because the co-creators' works were "works for hire" which "are not eligible for termination under Section 203," and that the artists' filing of the copyright termination notices has placed a "cloud" over "the movie and music copyrights" to *This Is Spinal Tap*.  This "cloud" allegedly has already damaged "StudioCanal's ability to distribute *Spinal Tap* and to otherwise enjoy its lawful rights to the movie."  [Doc. # 24 at 3:4-18.]

4.      Vivendi's claims are false:  *This Is Spinal Tap,* its characters and its music are not "works for hire."  They were developed before the artists entered into an agreement with Vivendi or its predecessors, and belong to the creators.  In their capacities as individual copyright holders, Harry Shearer, Rob Reiner, Christopher Guest, and Michael McKean seek a judicial declaration that the termination notices are valid and as such cannot support Vivendi's claims of damages.

5.      Section 203 of the Copyright Act of 1976 gives authors the right to terminate the grant of a copyright in "any work other than a work made for hire" made on or after January 1, 1978.  17 U.S.C. § 203(a).  To protect artists, Congress made clear that termination "may be effected notwithstanding any agreement to the contrary."  17 U.S.C. § 203(a)(5).  Termination is effected by serving a written notice upon the grantee or its successor any time during a five-year period generally starting 35 years after the date of the execution of the grant or the date of publication of the work. § 203(a)(3).  Because the 35-year period began with grants made in 1978, opportunities to serve termination notices under Section 203 started to accrue for the first time on January 1, 2013.

6.      *Spinal Tap* songs and characters were created starting in 1978, years before any agreement with Vivendi's predecessors.  The *Spinal Tap* band first appeared on television in 1979, in a skit for a series executive-produced by Reiner and produced by Shearer called *The T.V. Show*.  The band performed live for

audiences prior to any contract for *This Is Spinal Tap*.  The co-creators also registered copyrights in 1981 for the music and lyrics to "Stonehenge," "Big Bottom," "Sex Farm," "Gimme Some Money," and "(Tonight I'm Gonna) Rock You Tonight."  When the co-creators decided to make a feature they first created a 20-minute film, complete with fully-realized characters with backstories and musical performances with lyrics, to shop in lieu of a script.  Copyrights to these works belonged, unencumbered, to the co-creators upon their creation.  17 U.S.C. § 302(a) ("Copyright in a work created on or after January 1, 1978, subsists from its creation.")

7.    After showing the 20-minute film to the major studios, Reiner, Shearer, Guest and McKean decided to work with an independent studio, Embassy Pictures ("Embassy").  The co-creators incorporated a joint venture, Spinal Tap Productions ("STP") on May 6, 1982, and the next day signed an agreement with Embassy for production, financing, and distribution of "a motion picture presently entitled 'Spinal Tap.'"  The Agreement gave Reiner, Shearer, Guest and McKean creative control of the motion picture, including over the screenplay, music, and other elements of the film.  After editing all of the footage, the creators delivered an essentially finished product to Embassy, which was released in 1984 as *This Is Spinal Tap*.

8.    Embassy was assigned the co-creators' copyrights in the works pursuant to a so-called "Instrument of Transfer" dated May 7, 1982, whereby the co-creators assigned to STP, and STP assigned to Embassy, the following rights "in the feature motion picture presently entitled 'Spinal Tap':

> The sole and exclusive right in perpetuity to exhibit, distribute and exploit such motion picture and all elements thereof in all media, whether or not now known, throughout the universe, including, but not limited to, music and soundtrack rights, merchandising rights, video cassette and video disk rights, and theatrical sequel, theatrical remake and standard and non-standard television program rights."

RUSS, AUGUST & KABAT

9.     Embassy's assigned rights in the copyrights have changed hands several times.  The rights are currently claimed by StudioCanal and Universal Music Group subsidiary UMG Recordings, Inc., among others, pending reversion to Shearer, Reiner, Guest and McKean according to the co-creators' copyright termination notices.

10.     Vivendi has challenged those termination notices, claiming without further explanation that "the movie and its music were created as works for hire." [Doc. # 24 at 3:13.]  But to qualify as a "work made for hire," the work must either (1) be "prepared by an employee within the scope of his or her employment" or (2) be "specially ordered or commissioned" for use in one of nine enumerated categories of works "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101.

11.     The co-creators' works do not fall within these statutory criteria.

12.     The pre-May 7, 1982 works are clearly not "works made for hire." Those works predated any agreement with Embassy; were not prepared under any employment relationship; were not specially ordered or commissioned; and were not subject to any agreement that they be considered "works made for hire."  The co-creators therefore have the statutory right to recapture all copyrights to these works, including but not limited to copyrights to the musical compositions, sound recordings and *Spinal Tap* characters that appeared in the 20-minute film, and any other musical works created before May 7, 1982.

13.     The post-May 7, 1982 works are also not "works made for hire." The production agreement with Embassy only assigns the copyrights in the works to Embassy; it does not create any employer-employee relationship between the co-creators and Embassy and does not state that the works shall be considered "works made for hire" owned by Embassy.  Accordingly, the co-creators have the statutory right to recapture all copyrights to any of their works created on or after May 7, 1982, including but not limited to the screenplay, sound recordings, musical

compositions and characters appearing in *This Is Spinal Tap,* as well the screenplay and the film itself.

### Continuing and Amended Claims Against Vivendi and Vivendi's Subsidiary Universal Music Group.

14.     Harry Shearer, creator of the radio and podcast program "Le Show," and voice of some twenty-three characters on "The Simpsons," is co-creator of the movie classic *This Is Spinal Tap*, in which he performed as the musician Derek Smalls.

15.     Christopher Guest co-created *This Is Spinal Tap* and performed as the musician Nigel Tufnel.  Mr. Guest is also known for having written, directed and starred in films including "Waiting for Guffman," "Best in Show," "A Mighty Wind," "For Your Consideration," and "Mascots."

16.     Rob Reiner co-created and directed *This Is Spinal Tap* and performed as its fictional director Marty DiBergi.  Mr. Reiner is known for his work in notable films and television series, including his Emmy Award winning performances in "All in the Family" and as director of, among others, "Stand by Me," "The Princess Bride," "When Harry Met Sally…," "Misery," "A Few Good Men," and "The American President."

17.     Michael McKean co-created *This Is Spinal Tap* and performed as the musician David St. Hubbins.  Mr. McKean is also known for his performances in the films "Best in Show" and "A Mighty Wind" (in which he reunited with Guest and Shearer as The Folksmen), on "Saturday Night Live" and in the television series "Laverne & Shirley" and "Better Call Saul."

18.     *This Is Spinal Tap* and its music, which Shearer, Guest, McKean and Reiner co-wrote, including such songs as "Big Bottom" and "Stonehenge," have remained popular for more than thirty years, and have earned considerable sums for the French conglomerate Vivendi S.A. ("Vivendi").

19.     But not for the creators.  Defendant Vivendi and its agents, including

RUSS, AUGUST & KABAT

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

StudioCanal executive Ron Halpern, have engaged in anti-competitive business practices by manipulating the accounting between Vivendi film and music subsidiaries and have engaged in fraud to deprive the *Spinal Tap* creators of a fair return for their work.

20.     To address this fraud, Guest on his own behalf, and Shearer, Reiner and McKean on their own behalf and through their respective loan-out companies, Century of Progress Productions ("CPP"), Rob Reiner Productions and United Heathen, and Spinal Tap Productions ("Plaintiffs") bring the present action seeking not less than four hundred million dollars ($400,000,000) in compensatory and punitive damages, with the exact amounts to be determined through discovery and trial in this action.  Shearer, Guest, Reiner and McKean have also issued notices of copyright termination in their capacities as individual copyright holders and CPP has filed trademark applications on behalf of the *This is Spinal* Tap co-creators, to secure creative rights which have been abandoned by Vivendi.  Plaintiffs seek a judicial declaration vindicating those rights.

21.     Since the movie's release in 1984, *This Is Spinal Tap* music, merchandise, classic phrases and images have become ubiquitous in popular culture. The movie itself had two theatrical releases and has been re-sold in a number of commercial formats.  A series of companies has profited from merchandising, music, film, television and video rights.  For many years, Vivendi and its subsidiaries, including Canal Plus, StudioCanal, StudioCanal Image, Universal Music Group and UMG Recordings, Inc., have claimed and administered many of these rights and have been responsible for accounting to Plaintiffs.

22.     But according to Vivendi and its subsidiaries, the four creators' share of total worldwide merchandising income between 1984 and 2017 was $81 (eighty-one dollars).  Between 1989 and 2017 total income from music sales was $98 (ninety-eight dollars).  The most recent accounting statement dated as of December 31, 2017 – which Vivendi failed to deliver until June 27, 2018, about four months after it was

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

contractually due – also implausibly claims an unrecouped, *negative* balance of $13,451 (thirteen thousand four hundred fifty-one dollars) as a result of newly-claimed expenses, including $461,989 (four hundred sixty-one thousand, nine hundred eighty-nine dollars) in interest on "production advances" (for a film released in 1984) and an outrageous $256,876 (two hundred fifty six thousand, eight hundred seventy-six dollars) in "litigation exp[enses]" associated with Vivendi's repeated unsuccessful attempts to have this lawsuit dismissed.  The message is clear: Vivendi has no intention of honoring its obligations to account honestly or to fairly compensate the *Spinal Tap* co-creators for their work.

23.    Vivendi has engaged and is continuing to engage in anti-competitive and unfair business practices and has abandoned its obligations to enforce intellectual property rights in *This Is Spinal Tap,* unlawfully depriving Plaintiffs of substantial revenues.  Vivendi, in coordination with its subsidiaries StudioCanal and Universal Music Group, has also failed, and continues to fail, to account honestly for income actually received from *This Is Spinal Tap* and its associated musical compositions and sound recordings.

**THE PARTIES**

24.    Plaintiff Century of Progress Productions ("CPP") is a California corporation with its principal place of business in Sherman Oaks, California. CPP is the loan-out corporation of Plaintiff Harry Shearer ("Shearer"), a citizen of Louisiana, residing in New Orleans.

25.    Plaintiff Christopher Guest ("Guest") is a citizen of California, residing in Los Angeles.

26.    Plaintiff Rob Reiner Productions ("RRP") is a California corporation with its principal place of business in Beverly Hills, California.  RRP is the loan-out corporation of Plaintiff Rob Reiner ("Reiner"), a citizen of California, residing in Los Angeles.

27.    Plaintiff United Heathen ("UH") is a California corporation with its

RUSS, AUGUST & KABAT

principal place of business in Woodland Hills, California.  UH is the loan-out corporation of Plaintiff Michael McKean ("McKean"), a citizen of California, residing in Los Angeles.

28.     Plaintiff Spinal Tap Productions ("STP") is a California corporation that was incorporated on May 6, 1982 and at all times was entirely owned by CPP, Guest, RRP and UH.  Defendants have an ongoing duty to account and pay to STP and its owners all royalties and other monies due under the May 7, 1982 Agreement at issue in this lawsuit.  STP was dissolved in or about June 1986, and brings this action pursuant to California Corporations Code § 2010 to collect and distribute to its owners all royalties and other monies owed by Defendants.

29.     Defendant Vivendi S.A. ("Vivendi") is a French corporation headquartered in Paris, France, doing business in and engaging in acts affecting Plaintiffs within this judicial district.

30.     Defendant StudioCanal, S.A.S. ("Canal") is a subsidiary of Vivendi, headquartered in Paris, France, doing business in and engaging in acts affecting Plaintiffs within this judicial district.

31.     Defendant Ron Halpern ("Halpern") is an executive of Canal, resident in Paris, France, doing business in and engaging in acts affecting Plaintiffs within this judicial district.

32.     Defendants Universal Music Group, Inc. ("Universal Music") and its subsidiary UMG Recordings, Inc. ("UMG") (together "Universal Music Group") are subsidiaries of Vivendi, headquartered in Santa Monica, California, doing business in and engaging in acts affecting Plaintiffs within this judicial district.

33.     Does 1 through 10 are persons and/or entities whose true names and capacities are unknown to Plaintiffs and who participated in, conspired with, and/or caused Defendants to engage in the fraud and breaches of contract as alleged herein and who are otherwise responsible and liable to Plaintiffs for the wrongful acts alleged herein.  Plaintiffs will amend this Complaint to allege the true names and

Russ, August & Kabat

9

1  capacities of said defendants as they become known.

2  **JURISDICTION AND VENUE**

3  34.   This Court has jurisdiction under 28 U.S.C. § 1332 as the matter in

4  controversy exceeds the sum or value of $75,000 exclusive of interest and costs,

5  and the action when filed was between citizens of a State and citizens or subjects of

6  a foreign state.

7  35.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a)

8  because this action seeks declaratory judgment that Defendants lack rights to enforce

9  both abandoned trademarks under the Lanham Act, 15 U.S.C. § 1051 *et seq*. and

10  copyrights subject to termination under the Copyright Act, 17 U.S.C. § 203.

11  36.   Venue is proper in this district under 28 U.S.C. § 1391(b) because a

12  substantial part of the events that the claims are based upon occurred in this district.

13  37.   Jurisdiction and venue are proper in this Court because Defendants,

14  through their predecessor-in-interest Embassy Pictures, a California joint venture,

15  contractually consented to submit to the jurisdiction of the District Court of the

16  Central District of California.

17  **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

18  **The Genesis and Success of "*This Is Spinal Tap*"**

19  38.   Christopher Guest, Michael McKean and Harry Shearer first performed

20  together as *Spinal Tap* on a television show aired in July 1979 on ABC-TV.  They

21  later, with Rob Reiner, developed the characters in the *Spinal Tap* band and made a

22  20-minute film with improvised scenes and seven songs.  In the process of

23  attempting to turn that film into a feature-length movie, they formed a joint

24  partnership, Spinal Tap Productions ("STP"), which they incorporated on May 6,

25  1982.  On the strength of this work, on May 7, 1982, Guest and the loan-out

26  corporations of Reiner, Shearer, and McKean, as co-owners of STP, signed an

27  agreement (the "1982 Agreement") with Embassy Pictures ("Embassy") for

28  production, financing, and distribution of the motion picture *This Is Spinal Tap*

RUSS, AUGUST & KABAT

("TIST" or "the Film").

39.     Under the terms of the 1982 Agreement, STP and its principals Guest and the loan-out corporations of Reiner, Shearer and McKean were to receive fixed, deferred and contingent compensation in the form of profit participation payments based on all sources of revenue, including, without limitation, merchandise and music.

40.     TIST was released in 1984.  The renowned Chicago Sun film critic Roger Ebert described TIST as "absolutely inspired" in a 1984 review that well summarized the Film's appeal:

> Rock musicians never die, they just fade away, and "This Is Spinal Tap'' is a movie about a British rock group that is rocketing to the bottom of the charts.  It also is one of the funniest, most intelligent, most original films of the year.
>
> The movie looks like a documentary filmed during the death throes of a British rock band named Spinal Tap.  It is, in fact, a satire.  The rock group does not really exist, but the best thing about this film is that it could.  The music, the staging, the special effects, the backstage feuding and the pseudo-profound philosophizing are right out of a hundred other rock groups and a dozen other documentaries about rock.
>
> The group is in the middle of an American tour.  The tour is not going well.  Spinal Tap was once able to fill giant arenas, but its audiences have grown smaller and smaller, and concert dates are evaporating as the bad news gets around.  No wonder.  Spinal Tap is a bad rock 'n' roll band.  It is derivative, obvious, phony and pretentious, and it surrounds itself with whatever images seem commercial at the moment (a giant death's head on stage, for one).
>
> The movie is absolutely inspired in the subtle way it establishes Spinal Tap's badness.  The satire has a deft, wicked touch.  Spinal Tap is not that much worse than, not that much different from, some successful rock bands.  A few breaks here or there, a successful album, and they could be back in business. (Proof of that:  A soundtrack album, "Smell the Glove,'' is getting lots of airplay with cuts like "Sex Farm'').

RUSS, AUGUST & KABAT

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

41.     TIST was quickly recognized as a unique film with long-term appeal, as shown in its later inclusion in "best ever" lists such as *The New York Times Guide to the Best 1,000 Movies Ever Made; Entertainment Weekly's 100 Greatest Movies of All Time* where it appeared on the "Just Too Beloved to Ignore" list; and the *100 Greatest Movies of All Time* list published by Total Film.  Confirming TIST's strong international appeal and following, in 2011 *Time Out London* named the film number one on its list of The 100 Best Comedy Movies.  In 2002, the National Film Registry of the Library of Congress designated TIST as a culturally, historically, or aesthetically significant film.  TIST still enjoys popularity on television, home video, and other media, including a 25th Anniversary Blu-Ray DVD release in 2009.

42.     TIST was produced on a shoestring budget of approximately $2.25 million dollars.  On information and belief, TIST's enduring popularity has generated tens of millions of dollars in revenue in the thirty years since its original theatrical release, and its associated intellectual property has substantial value.

### The Terms of the Original 1982 Production Agreement

43.     The May 7, 1982 Agreement was drafted in several sections, including an eleven-page letter agreement with details of overall rights, obligations and compensation; a one-page Exhibit A Instrument of Transfer; a 48-page Exhibit B Standard Terms and Conditions, a fourteen-page Exhibit 1 to Exhibit B Formula for Computing Net Receipts, and a four-page Exhibit 2, Standard Delivery Items. The eleven-page letter agreement provides that in the event of any inconsistency between it and the Exhibit B Standard Terms and Conditions, the letter agreement "shall prevail."  (¶ 13.)

44.     The 1982 Agreement is signed by Guest as President of STP, and includes Inducement Letters from Shearer (on behalf of himself and Century of Progress Productions), Reiner (on behalf of himself and Rob Reiner Productions), Guest (on behalf of himself), and McKean (on behalf of himself and United Heathen).

12

RUSS, AUGUST & KABAT

45.    Paragraph 12 of the 1982 Agreement acknowledges that STP "is entirely owned by Rob Reiner Productions, United Heathen, Century of Progress Productions and Christopher Guest" and the Inducement Letters acknowledge that Rob Reiner Productions, United Heathen, Century of Progress Productions and Christopher Guest each "own one quarter (1/4) of all the shares of [STP]." Paragraph 13 of the 1982 Agreement further provides that "Embassy shall endeavor to add [STP], Rob Reiner Productions, United Heathen, Century of Progress Productions, Reiner, Shearer, McKean and Guest as additional named insureds in its errors and omissions insurance policy."

46.    The 1982 Agreement includes identification of the creative team obligations as the Film's screenplay writers, composers/songwriters and actors, and in the case of Reiner, additional directorial duties.

47.    The 1982 Agreement specified various sums of fixed compensation for the creative team, as well as contingent compensation calling for a split of Net Receipts 60% to Embassy and 40% to STP (¶ 4a and 4b).

48.    Because of the importance of the music to the creative essence of TIST, the parties negotiated and agreed to specific compensation to the co-creators relating to the exploitation of the Film's songs and sound recordings. With respect to the songs in the Film, all of which were composed by Shearer, Guest, McKean and Reiner, and the sound recordings embodying those compositions, all of which feature the musical performances of Shearer, Guest, and McKean, the 1982 Agreement calls for payment to Shearer, Guest, McKean and Reiner of 50% of the gross receipts from said music as well as a separate 6% performers' royalty plus a 3% producer royalty payable directly to them based on the retail price of any soundtrack albums (¶ 6). With respect to the musical compositions, the 1982 Agreement requires payment of 50% of gross receipts to Shearer, Guest, McKean and Reiner (¶ 6). Such sums were payable in addition to STP's entitlement to Net Receipts pursuant to section 4 of the 1982 Agreement.

49.     Under the 1982 Agreement, Embassy promises, *inter alia*, to send Earnings Statements to STP showing the calculation of Net Receipts, first on a monthly, then quarterly, and after approximately three years, on an annual basis. But Vivendi, Embassy's successor-in-interest, has breached and continues to breach these promises.

### The Embassy - PolyGram Agreement

50.     The TIST co-creators completed principal photography of the Film in or about late 1982 and delivered the completed Film to Embassy in 1983. Embassy arranged for the theatrical release of TIST in or about March 1984.

51.     The TIST co-creators' songs and musical performances were an essential part of the Film and significantly contributed to TIST's enduring popularity and appeal. The parties specifically contemplated that the Film's soundtrack album would be marketed and sold to coincide with, and take advantage of, the Film's nationwide theatrical release in or about March 1984.

52.     In preparation for the TIST soundtrack album release, on or about June 30, 1983, Embassy entered into an agreement with PolyGram Records ("PolyGram"), pursuant to which Embassy assigned PolyGram the right to market, sell and exploit the soundtrack album and sound recordings from TIST, including an assignment of the copyrights in such sound recordings (the "PolyGram Agreement"). At the time of the PolyGram Agreement, PolyGram was aware of the 1982 Agreement and that, pursuant to the 1982 Agreement, the TIST co-creators wrote the musical compositions in TIST, performed on the sound recordings that would appear on the soundtrack album, and would act as producers of the soundtrack album. Based on the circumstances and negotiations, PolyGram also knew, or reasonably expected, that Plaintiffs were entitled to receive a share of the revenues derived from the exploitation of the TIST soundtrack album and sound recordings, including royalties to the co-creators as performers and producers of the sound recordings based on the retail sales price of the soundtrack album, which

RUSS, AUGUST & KABAT

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

would be calculated based on the units sold and/or licensed by PolyGram. In addition, PolyGram knew, or reasonably expected, that Embassy would report PolyGram's accountings for soundtrack revenues directly to Plaintiffs through Embassy's accounting statements.

53. Pursuant to the PolyGram Agreement, PolyGram agreed to market and exploit the TIST soundtrack album and recordings, diligently collect the revenues from sales and licenses of such recordings, faithfully and accurately account for such revenues (including the revenues that comprised the co-creators' 6% performers' royalty and 3% producer's royalty), and timely report and pay such revenues and royalties to Embassy knowing that Embassy, in turn, would directly report and pay them to Plaintiffs. Plaintiffs are informed and believe that the PolyGram Agreement includes accounting provisions that gave Embassy and its successors the right to receive regular, truthful accounting statements and review the underlying books and records to ensure that PolyGram's reportings were complete and accurate. Plaintiffs are further informed and believe that the PolyGram Agreement either directly references Plaintiffs' right to receive such revenues and record royalties, or at a minimum was entered into with knowledge that Plaintiffs, as co-creators, performers and producers of the sound recordings, were entitled to receive such revenues and royalties. By virtue of the PolyGram Agreement, Embassy intended to give PolyGram the benefit of distribution of the TIST soundtrack album and recordings, and the obligation of collection and payment of the associated soundtrack revenues and royalties on Plaintiffs' behalf.

54. Likewise, at the time of the PolyGram Agreement, Plaintiffs expected that PolyGram would market and exploit the TIST soundtrack recordings, and would diligently collect the revenues and accurately report and pay the revenues to Embassy for Plaintiffs' benefit. Plaintiffs communicated with PolyGram regarding the TIST soundtrack album, knowing that the album would be an important source of revenues for Plaintiffs and a material component of the Film's success.

55.     Embassy and PolyGram entered into the PolyGram Agreement for the express benefit of Plaintiffs. The parties to the PolyGram Agreement intended to directly benefit Plaintiffs by having PolyGram market, distribute and otherwise exploit Plaintiffs' sound recordings, collect and recover revenues on Plaintiffs' behalf, and accurately account, report and pay Embassy the revenues in which Plaintiffs share and the performers' record royalties and producer's record royalties to which the TIST co-creators were directly entitled. Accordingly, Plaintiffs were intended third party beneficiaries of the PolyGram Agreement and are entitled to enforce PolyGram's (and its successors-in-interest's) obligations to accurately account thereunder.

56.     Through the PolyGram Agreement, PolyGram also received the benefits of Plaintiffs' services under the 1982 Agreement, which called on Plaintiffs to write the musical compositions and perform on and produce the TIST soundtrack album. As a result, PolyGram also assumed the obligation to ensure that the TIST co-creators would receive accurate performer and producer royalties in addition to their share of the profits as compensation for their musical recording services under the 1982 Agreement. Embassy engaged PolyGram specifically to satisfy its soundtrack-related obligations to Plaintiffs, including the collection and accurate reporting of soundtrack revenues and royalties.

57.     Plaintiffs Shearer, Guest, and McKean did in fact perform on and produce the TIST soundtrack album which was successfully released by PolyGram in or about March 1984. PolyGram also marketed and sold a "single" from the soundtrack album consisting of the tracks "Hell Hole" and "Big Bottom." Plaintiffs are informed and believe that PolyGram earned substantial sums from the TIST soundtrack album and single, and that such recordings continue to earn substantial sums for PolyGram's successor UMG and its parent Vivendi.

58.     In or about 1998, PolyGram was acquired by Seagram Company, Ltd. ("Seagram"), and was merged into Seagram's music holdings. By this acquisition,

RUSS, AUGUST & KABAT

PolyGram became merged into UMG, a subsidiary of Universal Music. As a result, UMG acquired all applicable TIST sound recording rights, accepted the benefits and assumed the obligations in the PolyGram Agreement, and became responsible for collecting and reporting the TIST sound recording revenues and royalties. Universal Music is responsible for accounting to Canal under the PolyGram Agreement through its subsidiary UMG, the entity though which it controls and administers the TIST sound recording rights.

59.     UMG and Universal Music knew, or reasonably expected, that Canal, as Embassy's successor under the PolyGram Agreement, would report UMG's accountings for TIST soundtrack revenues directly to Plaintiffs. The revenues reported by UMG are in fact expressly included in the accounting statements sent by Canal to STP, which specifically include line items for "Gross Receipts — Music." UMG also admittedly claims to control the copyrights in the Spinal Tap sound recordings as PolyGram's successor-in-interest.

60.     At the time UMG succeeded to PolyGram's rights and obligations under the PolyGram Agreement, UMG and Universal Music were already aware of Shearer's, Guest's and McKean's right to receive revenues and royalties from their musical recordings performed as the Spinal Tap band. By virtue of its ownership of MCA Records, Inc. ("MCA"), UMG expressly assumed the obligation to directly account to Shearer, Guest and McKean, through their company Pairapance Communications, Inc., with respect to the group's 1992 follow-up album entitled "Break Like the Wind." Likewise, UMG, as a result of a separate corporate acquisition, succeeded to the rights and obligations of Enigma Records, Inc. ("Enigma") with respect to another Spinal Tap single recording entitled "Christmas with the Devil". UMG included two different versions of "Christmas with the Devil" as bonus tracks on a 2000 re-release of the TIST soundtrack album. Therefore, in addition to its assumption of PolyGram's obligations under the PolyGram Agreement, UMG and Universal Music were separately aware that the co-creators

RUSS, AUGUST & KABAT

17

of TIST were entitled to soundtrack revenues and royalties resulting from UMG's distribution and exploitation of the TIST sound recordings.

61.     In or about 2000, UMG and Universal Music became part of the Vivendi multi-national conglomerate. At or about such time, UMG and Canal became sister subsidiary companies under the Vivendi corporate umbrella, and so the obligation to collect and report revenues from both the TIST feature film and the associated soundtrack recordings were now within the same corporate ownership. Plaintiffs could not count on Vivendi/Canal requiring that UMG accurately report all TIST soundtrack revenues given that Vivendi and Canal now had a motive to retain as much of the revenues (including the soundtrack revenues administered by UMG) within the Vivendi corporate empire rather than share such revenues with Plaintiffs. It therefore became, and continues to remain, even more important that Plaintiffs could directly enforce PolyGram's (now UMG's) obligations as third party beneficiaries in order to protect their interest in such revenues.

## Defendants' Acquisition of the Rights and Obligations in TIST, and Fraudulent Accounting

62.     After the release of TIST in 1984, the catalog of Embassy, including unsuccessful films "bundled" with TIST, was acquired several times in a succession of transactions including sales to the Coca Cola Company, Parafrance, a subsidiary of L'Oreal and the DeLaurentiis Entertainment Group, Inc.  In or around 1989, predecessors of Vivendi's subsidiaries acquired pertinent TIST rights.

63.     Vivendi (through its subsidiary Canal) is responsible for accounting under the 1982 Agreement.  Some profit participation statements were historically submitted to STP, c/o Creative Artists Agency ("CAA"), Reiner's agent.  CAA does not and did not represent STP or Shearer, Guest or McKean or their respective loan-out companies.  Those profit participation statements, Plaintiffs have recently discovered, reflect anti-competitive and unfair business practices in their self-dealing and wrongful sharing of revenues between different Vivendi subsidiaries.  Vivendi

RUSS, AUGUST & KABAT

also unfairly bundled and cross-collateralized unsuccessful films in the Embassy catalogue with TIST and fraudulently underreported the revenues owed to Plaintiffs. The most recent participation statement "for the period ending December 31, 2017," which Vivendi delivered to STP c/o CAA on June 27, 2018 after this lawsuit was filed, reports that "[a]t this time, no payment is due" to the artists, because the *Spinal Tap* co-creators supposedly now have a negative balance of $13,451 in unrecouped expenses, including Defendants' own legal fees in this lawsuit.

64.    Revenue streams arising from the Film, including sound recordings and music publishing, were also included in the 1982 Agreement.  As alleged above, the soundtrack music rights are now claimed by entities including another subsidiary of Vivendi, UMG, which has an obligation to report and pay Canal, which in turn has an obligation to report and pay Plaintiffs pursuant to Defendants' accounting obligations.

65.    Notwithstanding its obligations as successor to PolyGram under the PolyGram Agreement, UMG has failed to issue timely accounting statements, or correctly report and pay the applicable revenues and royalties for sales and licenses of the TIST sound recordings to Canal for Plaintiffs' express benefit. Instead, Plaintiffs are informed and believe that, among other things, UMG has improperly siphoned off revenues to affiliated foreign and domestic affiliates, failed to accurately report unit sales and corresponding revenues, underreported licensing fees, including licensing receipts from various music services, incorrectly applied royalty rates and bases, overstated the number of "free" goods, applied incorrect foreign exchange and tax withholding rates, inflated administrative expenses and other deductions from revenues, and fraudulently represented the units sold and revenues received, knowing that Canal would repeat this fraudulent accounting in Canal's own accounting statements to STP and in other communications with Plaintiffs.

66.    The accounting between the Vivendi subsidiaries is not at arm's-length, is anti-competitive, and deprives the TIST creators of a fair reward for their work. Particularly given that Vivendi has offset fraudulent accounting for revenues from

RUSS, AUGUST & KABAT

music copyrights against equally dubious revenue streams for film and merchandising rights also controlled by Vivendi subsidiaries, Shearer, Reiner, Guest and McKean have filed notices of copyright termination for publishing and recording rights in *Spinal Tap* songs they co-wrote and co-recorded, as well as in the screenplay to the film and the film itself, so that the TIST co-creators can control and maximize the future revenues from their iconic creative works.

### CPP Investigates Defendants' Accounting and Discovers their Fraudulent Conduct

67.     In 2013, in anticipation of TIST's upcoming 30th Anniversary in 2014, CPP commissioned a study of the accounting statements and revenue streams associated with TIST.  CPP learned the results of that study in or around November 2013, although many questions regarding Defendants' accountings remain unanswered and can only be determined through discovery in this action.

68.     CPP and Shearer then first discovered that Vivendi and its subsidiaries Canal, which administers and has a duty to account for revenue streams associated with the movie rights, and Universal Music Group, which administers and has a duty to account for revenue streams associated with the soundtrack music rights, had engaged in a pattern of anti-competitive and unfair business practices, had abandoned enforcement of valuable TIST rights, and had willfully concealed and manipulated years of accountings to retain monies due and owing to Plaintiffs. The other plaintiffs did not become aware of the bases for their claims until after the initial complaint in this lawsuit was filed on October 17, 2016.

69.     Examples of Defendants' willful misconduct and intentional concealment of material facts in the accounting statements designed to deceive Plaintiffs and prevent them from discovering Vivendi's ongoing fraudulent accounting practices include but are not limited to:

- failure to remit statements and accountings, with gaps occurring in years that would have enhanced revenue, despite numerous requests for these statements made prior to the initiation of this lawsuit;

RUSS, AUGUST & KABAT

- failure to account for monies received, including a 2004 settlement payment received from MGM Home Video totaling over $1.6 million dollars for underreported VHS and DVD revenues, when statements for the year 2004 were never submitted to Plaintiffs by Defendants;

- failure to account for and/or collect monies from exploitation of the soundtrack music rights claimed and administered by the Universal Music Group, which has reported a mere $98 (ninety-eight) dollars in gross receipts from music sales from 1989 to 2017;

- improper expense deductions, including undocumented expenses for "Prints" and "Advertising & Publicity" allegedly totaling over $3.3 million;

- undocumented charges to "Freight and other Direct Costs" totaling $1,101,424, with over $600,000 allegedly incurred from 2007 to 2017, more than *twenty* years after the film's initial release, and nearly $100,000 incurred from 2014 to 2016;

- failure to account for monies under the terms of the 1982 Agreement as "actually received by Embassy in the United States";

- failure to account for and/or collect revenue on merchandise and for use of material protected by *Spinal Tap* trademarks and copyrights;

- omission of material information concerning Vivendi's self-dealing and wrongful sharing of revenues from different Vivendi subsidiaries, including the improper and disproportionate allocation of costs and bundling and cross-collateralization of unsuccessful films in the Embassy catalogue; and

- misrepresenting, through the accounting statements that Canal delivered to STP, that there were no new sound recording, music publishing, or merchandising revenues attributable to TIST for years.

70.     Ron Halpern, during his management of the exploitation of TIST from 1996 to 2009 repeatedly assured Plaintiffs and their agents during the same time period, including their manager Harriet Sternberg who represented the band from 1992 through 2009, that he and his staff were fully supportive of the band and supported the co-creators' efforts to get all of the revenue they deserved.  Mr. Halpern also assured attorney Barry Tyerman, who represented the band from September 2008 through 2009, that Mr. Halpern and his staff were fully complying with the 1982 Agreement, were providing accurate and reliable accountings to

RUSS, AUGUST & KABAT

Plaintiffs – which included gross receipts and expenses from the film, television, movie and merchandising rights claimed and administered by Canal, and gross receipts and expenses from the soundtrack music rights claimed and administered by the Universal Music Group – and were using all available means to promote *Spinal Tap* assets and enforce *Spinal Tap* intellectual property to maximize revenue for the *Spinal Tap* creators.

71.     From 2010 to 2012 Harry Shearer's business managers at the firm Power & Twersky made numerous, specific requests for all participation statements relating to *This Is Spinal Tap.*  Vivendi's agent at Canal, Barbara DiNallo, contacted Power & Twersky on June 14, 2011, and "confirmed that [she] received [the] previous requests for all participation statements" and "stated that [she] would be able to comply by the end of June 2011."

72.     Plaintiffs reasonably relied on these assurances.  But the representations by Defendants' agents Ron Halpern and Barbara DiNallo were knowingly false when made or were made recklessly and without regard for their truth.  Despite Plaintiffs' reasonable diligence, CPP and Shearer were unaware until in or around November 2013, and the remaining plaintiffs were unaware until after the initial complaint in this lawsuit was filed in October 2016, that Mr. Halpern, Vivendi and its subsidiaries had intentionally engaged in an extended and outrageous pattern of fraud and misconduct, and had abandoned their obligations to enforce intellectual property rights in *This Is Spinal Tap,* unlawfully depriving Plaintiffs of substantial revenues.

73.     During a telephone call on September 23, 2004 concerning a major discrepancy with MGM Home Video's reporting to Canal of *This Is Spinal Tap* DVD and VHS sales which would have entitled Plaintiffs to additional royalties, Mr. Halpern assured Ms. Sternberg that he would speak with Canal's Senior Vice President and Chief Financial Officer (CFO), Robert Chamberlain, and promised that he would "continue to support [the co-creators] efforts in getting the money that [they] deserve[d]."  Ms. Sternberg was later informed in a letter dated December 16,

22

RUSS, AUGUST & KABAT

2004 that the auditor hired by Canal was unable to confirm that MGM reported the video sales properly and recommended that Ms. Sternberg discuss the matter with MGM.  Only when CPP received the report it commissioned in 2013 did CPP and Shearer discover that Vivendi had received a settlement payment from MGM for more than $1.6 million in 2004.  That settlement payment was intentionally hidden from Plaintiffs:  Vivendi to this day has failed to provide an accounting statement for the year 2004, and the $1.6 million settlement does not appear on any of the other accounting statements provided to Plaintiffs.

74.     UMG and Universal Music have also made affirmative misrepresentations regarding the number of sound recording units sold, revenues collected and expenses incurred, and concealed material information regarding their self-dealing and improper accounting methods, through the false and misleading accounting statements they provided to Canal, and in other communications that representatives of UMG and Universal Music had with Mr. Halpern in connection with TIST. The details of the communications between representatives of Universal Music Group and Canal/Vivendi are presently within the exclusive knowledge of Defendants, and will be the subject of discovery in this action. UMG and Universal Music knew, or had reason to know, that their misrepresentations and concealment of material facts regarding the soundtrack revenues and related fraudulent accountings (and in particular the false statements included in UMG's accounting statements issued to Canal) would be repeated directly by Canal to Plaintiffs.

75.     Vivendi and its agents have also failed to enforce and collect revenue from *Spinal Tap* intellectual property for a wide range of unlicensed products infringing *Spinal Tap* trademarks and copyrights, including but not limited to a book titled "Smell the Glove" "a Little Stonehenge Book" featuring cartoon images of co-creators Shearer, Guest and McKean as the film's musicians Derek Smalls, Nigel Tufnel, and David St. Hubbins; a McDonald's promotion using the *Spinal Tap* slogan "Our Taste Goes to Eleven" with a picture of a guitar amp knob; infringing

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

merchandise, including "Spinal Tap – Volume 11" clothing, "Spinal Tap" necklaces, "This Is Spinal Tap" movie posters, "Spinal Tap" Matryoshka dolls, and even packaging tape sold as "This Is Spinal Tape"; and brewing companies selling their beer with *Spinal Tap* slogans including Bell's Brewery's "This One Goes to 11 Ale" and Full Sail Brewing Company marketing its "Session Premium Dark Lager" as "A beer that goes to 11."

76.    In advance of the theatrical re-release of the film in 2000, managed for Canal by Ron Halpern, Mr. Shearer was asked to fly to London to meet with Halpern.  During that meeting, a luncheon at the Groucho Club, Mr. Halpern informed Mr. Shearer that, in accord with Mr. Shearer's preferences to support "indies" – independent, creative, entrepreneurial companies – the United Kingdom re-release rights were being assigned to a small "boutique" distributor, who would welcome Shearer's personal involvement in marketing and advertising advice for the re-release.  Mr. Shearer responded by sharing ideas with Halpern at that meeting. When Shearer returned to Los Angeles, he learned that in fact the United Kingdom distributor was not an independent "boutique," but a subsidiary of Metro-Goldwyn-Mayer.  Mr. Shearer knew then that Ron Halpern was mendacious.  But Shearer never imagined, until his review of a report in or around November 2013, that Halpern was capable of the level of deception and willingness to subvert contractual obligations that characterized Halpern's mistreatment of the *Spinal Tap* creators.

77.    On information and belief, the conduct described here, including financial accounting, intellectual property and legal policies and practices of Canal and Universal Music Group, as well as the personal practices of Ron Halpern, are coordinated, controlled and directed by Vivendi.  Canal, Universal Music Group and Ron Halpern are both ostensible and actual agents for Vivendi, and Vivendi has liability for the acts of each of these agents.

78.    Vivendi is also liable for the conduct of Canal, Universal Music Group and Ron Halpern as alleged herein because, at all relevant times, there existed a

RUSS, AUGUST & KABAT

unity of interest and ownership between them such that any separate corporate personalities no longer exist and adherence to the fiction of their separate existence would permit an abuse of the corporate form and would sanction fraud and promote injustice against Plaintiffs.

79.     Vivendi touts itself as "an integrated media and content group" which "operates businesses throughout the media value chain, from talent discovery to the creation, production and distribution of content" through its "main subsidiaries" Canal and Universal Music Group.

80.     Vivendi's subsidiaries do not have interests independent from Vivendi with respect to the exploitation of media and accounting obligations owed to Plaintiffs.  They operate in practice as arms or divisions of Vivendi, responsible for administering Vivendi's accounting obligations under the direction and control of Vivendi.  As reported in November 2015, Canal and Universal Music Group both "boosted Vivendi's results … as the French conglomerate continues its transformation into a global media and entertainment company."

81.     Vivendi, Canal and Universal Music Group have abused the corporate form and colluded to defraud Plaintiffs and retain all of the income from TIST and the associated music within the Vivendi conglomerate by, *inter alia*, engaging in anti-competitive and unfair self-dealing between Vivendi subsidiaries; cross-collateralizing unsuccessful films bundled with TIST in their accounting; failing to remit accounting statements; failing to respond to inquiries and information requests; failing to keep accurate records; failing to include or properly report revenues in accounting statements; claiming undocumented and false expenses as part of a fraudulent scheme to deprive Plaintiffs of their contractual rights; and failing to diligently exploit and maximize available revenue streams.

82.     Vivendi also exercises direct control over its subsidiaries through the appointment of overlapping executives.  For example, Vivendi's Chief Executive Officer, Arnaud de Puyfontaine, who serves as Chairman of Vivendi's Management

Board, also serves as a Member of the Supervisory Board for both the Canal+ Group and StudioCanal.  In 2011, Vivendi appointed Lucian Grainge as the new Chairman and Chief Executive Officer of Universal Music Group, who Vivendi announced would continue to report to Vivendi's Chief Executive Officer and serve as a member of the Vivendi Management Board.

83.    This is not the first time that Vivendi has directed and engaged in fraudulent accounting involving its subsidiaries.  In 2003, Vivendi paid $50 million and its former chief executive officer relinquished claims to a €21 million severance package to settle a civil fraud action that the United States Securities and Exchange Commission (SEC) prosecuted against Vivendi and its top executives concerning alleged financial fraud involving Vivendi's subsidiaries.

**The SPINAL TAP Trademark**

84.    In 1984, Defendants' predecessor, Embassy, filed a trademark application with the United States Patent and Trademark Office (USPTO) for the mark SPINAL TAP.  The federal registration for that mark was cancelled by the USPTO in 1991 as a direct result of its (or its successor-in-interest's) failure to submit documents necessary to maintain the registration. In early 2000, Defendants' predecessors filed certain other federal trademark registration applications with the USPTO for the mark SPINAL TAP as shown in Exhibit 1 hereto.  In or about March 2002, as shown in Exhibit 2 hereto, the rights to those marks were conveyed to StudioCanal Image, a Vivendi subsidiary that subsequently merged into Canal, which is still identified by the USPTO as the last listed owner for those federal registrations.

85.    Defendants subsequently abandoned, with no intent to resume, all rights to the SPINAL TAP marks, and the federal registrations for those marks were cancelled by the USPTO in 2011 and 2012 as shown in Exhibit 1 hereto as a direct result of Defendants (or their predecessors') failure to submit documents necessary to maintain these registrations. As additional evidence of such abandonment,

RUSS, AUGUST & KABAT

Defendants did not oppose a trademark application filed on December 27, 2013 by Heretic Brewing Company to register the mark SPINAL TAP in connection with "beer" products, and that mark was registered by the USPTO on April 7, 2015 as shown in Exhibit 3 hereto.

86.     Because the SPINAL TAP marks have been abandoned by Defendants, CPP, on behalf of each of the four co-creators, has filed applications for federal registrations of the mark SPINAL TAP as set forth in Exhibits 4 through 5 hereto.

**COUNT I**

**Breach of Contract – May 1982 Agreement**

**(Against Vivendi and Canal)**

87.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 86 above, as if fully set forth herein.

88.     Defendant Canal, through its predecessor-in-interest Embassy, entered into the May 7, 1982 Agreement with Spinal Tap Productions ("STP") which was entirely owned by Plaintiffs Guest, CPP, RRP and UH.  (¶ 12.)  Defendants Vivendi and Canal have an ongoing duty to account and pay to Plaintiffs all revenues, royalties and other monies due under the 1982 Agreement.  Vivendi is responsible for accounting under the 1982 Agreement, through its subsidiary Canal, which administers film, television, video and merchandising rights relating to TIST.

89.     STP, although dissolved in or about June 1986, has the right to prosecute this action against Defendants to enforce the 1982 Agreement and collect and distribute to its owners all royalties and other monies owed them pursuant to California Corporations Code § 2010.

90.     Plaintiffs Guest, Shearer, Reiner, and McKean also have standing to enforce the 1982 Agreement pursuant to California Civil Code § 1559 because each of them is an intended third-party beneficiary of the 1982 Agreement.  The 1982 Agreement was expressly made for their benefit as acknowledged in the various provisions of the 1982 Agreement calling for their essential creative services as

RUSS, AUGUST & KABAT

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

"Screenplay Writers," "Composers/Songwriters," "Actors" and, in the case of Reiner, as "Director/Actor"; in Paragraphs 4 and 6 of the 1982 Agreement which expressly provide for payments – in fixed, deferred and contingent compensation and royalties from music – to Guest, Shearer, Reiner and McKean; in Paragraph 7 which expressly grants them rights to appear as actors in any *Spinal Tap* remakes or sequels at two times the fixed and deferred compensation and the same contingent compensation each received for their services in the original Film, or royalties if they did not act in such sequels or remakes; in Paragraph 8 which requires payments to Guest, Shearer, Reiner and McKean for any television programs and grants them rights as director, writers and actors in such television programs; and in Paragraph 13 which required Embassy to seek to add Guest, Shearer, Reiner and McKean "as additional named insureds in its errors and omissions insurance policy."

91.     In the alternative, the loan-out companies of Shearer, Reiner and McKean, namely Plaintiffs CPP, RRP and UH, have standing to sue as intended third-party beneficiaries of the 1982 Agreement because the contracting parties specifically negotiated and intended that these loan-out companies would be the recipients of the three co-creators' benefits under the 1982 Agreement.  The use of loan-out companies in the 1982 Agreement with Vivendi's predecessor by three of the co-creators was demanded by the artists and negotiated to provide certain tax and liability benefits for those artists.  Although not specifically articulated in the "Inducement Letters" which formed part of the 1982 Agreement, a core purpose of the loan-out agreements, fully understood by all parties to the 1982 Agreement and custom and practice in the film industry, was to create corporate protection for the artists' receipt of benefits and proceeds from the 1982 Agreement.  The three co-creators who negotiated for the use of loan-out companies intended, and Vivendi's predecessor agreed, that payments and other benefits to the artists under the 1982 Agreement would be received by the loan-out companies rather than the artists in their individual capacities.  The Inducement Letters attached to the 1982 Agreement

confirm this bargained-for agreement:  In exchange for Shearer, Reiner and McKean's right to receive the benefits of being paid through their loan-out companies, they and their respective loan-out companies each agreed to "to perform all of the personal services required of [them under the 1982 Agreement]" and further agreed that in the event of any breach of the 1982 Agreement, Embassy "may proceed directly against the [loan-out company or the co-creator], and may obtain equitable relief … as though such breach were committed by the [loan-out company or the co-creator]."  This negotiated arrangement reflects the contracting parties' clear intent to confer both benefits and obligations on the co-creators' loan-out companies making them intended third party beneficiaries.  Paragraph 13 of the 1982 Agreement, which requires Embassy to seek to add the individual co-creators as well as CPP, RRP and UH "as additional named insureds in its errors and omissions insurance policy" further confirms that the loan-out companies were intended third-party beneficiaries under the 1982 Agreement.  Shearer, Reiner and McKean do not seek double recovery with their loan-out companies for any benefits they may receive from the present litigation, but do not waive their negotiated right to receive those benefits through their loan-out companies.

92.    At all times, Plaintiffs performed their obligations under the 1982 Agreement.

93.    Defendants have breached and are in continuing breach of their obligations under the 1982 Agreement by, *inter alia*, engaging in anti-competitive and unfair self-dealing between Vivendi subsidiaries; cross-collateralizing unsuccessful films bundled with TIST in their accounting; failing to remit accounting statements; failing to respond to inquiries and information requests; failing to keep accurate records; failing to include or properly report revenues in accounting statements; claiming undocumented and false expenses as part of a fraudulent scheme to deprive Plaintiffs of their contractual rights; and failing to diligently exploit  and maximize available revenue streams.

RUSS, AUGUST & KABAT

94.    Plaintiffs have been and continue to be damaged by Defendants' illegal acts and contractual breaches in amounts to be proven at trial.

## COUNT II

**Breach of the Implied Covenant of Good Faith and Fair Dealing – May 1982 Agreement**

**(Against Vivendi and Canal)**

95.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 94 above, as if fully set forth herein.

96.    The May 7, 1982 Agreement, governed by California law, contains an implied covenant of good faith and fair dealing.  Defendants Vivendi and Canal breached this implied covenant by their acts, including the anti-competitive and unfair business practices among Vivendi subsidiaries alleged herein.

97.    Defendants have intentionally abused their power to frustrate Plaintiffs' right to receive the benefit of the bargain made in the 1982 Agreement, in a manner that goes beyond mere breach of the 1982 Agreement, but as part of an intentional scheme abusing Defendants' discretionary power to deprive Plaintiffs of the benefits contemplated in the 1982 Agreement.

98.    Plaintiffs have been damaged by Defendants' wrongful conduct in amounts to be proven at trial.

## COUNT III

**Breach of Contract – PolyGram Agreement**

**(Against Universal Music and UMG)**

99.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 98 above, as if fully set forth herein.

100.    Defendant UMG, through its predecessor PolyGram, entered into the June 30, 1983 PolyGram Agreement with Embassy, the predecessor to Canal and its parent Vivendi. Pursuant to the PolyGram Agreement, UMG has an ongoing duty to administer the TIST sound recording rights, and diligently exploit and maximize

30

the revenues from the TIST soundtrack album and sound recordings. UMG further has a duty to accurately account and pay to Canal all revenues, royalties and other monies due under the PolyGram Agreement, knowing that a portion of such revenues was payable to Plaintiffs, including performer/producer royalties based on the retail sales price of the TIST soundtrack album that are owed directly to the TIST co-creators. Universal Music is responsible for accounting under the PolyGram Agreement, through its subsidiary UMG, the entity through which it controls and administers the TIST sound recording rights.

101.   At the time UMG succeeded to PolyGram's rights and obligations under the PolyGram Agreement, UMG was already aware of Plaintiffs' right to receive revenues and royalties from their musical recordings performed as the Spinal Tap band by virtue of its direct obligations to account to Shearer, Guest and McKean with respect to the "Break Like the Wind" album and the single recording entitled "Christmas with the Devil." Therefore, in addition to the knowledge of its obligations under the PolyGram Agreement, UMG was separately aware that the co-creators of TIST were entitled to receive soundtrack revenues and royalties resulting from UMG's distribution and exploitation of the TIST recordings. UMG and Universal Music's performance of the PolyGram Agreement is necessary to render to Plaintiffs the direct benefit intended by the parties to the PolyGram Agreement.

102.   Plaintiffs Guest, Shearer, Reiner, and McKean have standing to enforce the PolyGram Agreement pursuant to California Civil Code § 1559 because each of them is an intended and direct third-party beneficiary of the PolyGram Agreement. The PolyGram Agreement was expressly made for their benefit because the parties to the PolyGram Agreement were aware, under the circumstances, that these individuals created, performed and produced the sound recordings at issue, and were entitled to share in the revenues therefrom as well as specific royalties from the sale and license of the TIST soundtrack album pursuant to the express

RUSS, AUGUST & KABAT

terms of section 6 of the 1982 Agreement. Because Universal Music, through its subsidiary UMG, marketed and exploited the TIST soundtrack album, UMG and Universal Music were obligated to truthfully and accurately report the soundtrack revenues, including revenues based on the retail sales price of the soundtrack album, for the benefit of Guest, Shearer, Reiner and McKean.

103.   In the alternative, the loan-out companies of Shearer, Reiner and McKean, namely Plaintiffs CPP, RRP and UH, have standing to sue as intended third-party beneficiaries of the PolyGram Agreement because the contracting parties specifically negotiated and intended that these loan-out companies would be the recipients of the three co-creators' benefits under the PolyGram Agreement. As alleged herein above in Paragraph 91, the use of loan-out companies in the 1982 Agreement with Vivendi's predecessor by three of the co-creators was demanded by the artists and negotiated to provide certain tax and liability benefits for those artists. Although not specifically articulated in the "Inducement Letters" which formed part of the 1982 Agreement, a core purpose of the loan-out agreements, fully understood by all parties to the 1982 Agreement and custom and practice in the film industry, was to create corporate protection for the artists' receipt of benefits and proceeds from the 1982 Agreement. The three co-creators who negotiated for the use of loan-out companies intended, and Vivendi's predecessor agreed, that payments and other benefits to the artists under the 1982 Agreement would be received by the loan-out companies rather than the artists in their individual capacities. The Inducement Letters attached to the 1982 Agreement confirm this bargained-for agreement: In exchange for Shearer, Reiner and McKean's right to receive the benefits of being paid through their loan-out companies, they and their respective loan-out companies each agreed to "to perform all of the personal services required of [them under the 1982 Agreement]" and further agreed that in the event of any breach of the 1982 Agreement, Embassy "may proceed directly against the [loan-out company or the co-creator], and may obtain equitable relief ... as though such breach were

RUSS, AUGUST & KABAT

committed by the [loan-out company or the co-creator]."  This negotiated arrangement reflects the contracting parties' clear intent to confer both benefits and obligations on the co-creators' loan-out companies making them intended third party beneficiaries. Accordingly, because the co-creators performed the required services under the terms of the 1982 Agreement, including the contemplated musical recording services, their loan-out companies have standing to sue as third party beneficiaries of the PolyGram Agreement which was entered into for their express benefit as the parties entitled to receive revenues and royalties in connection with the TIST sound recordings.

104.   Plaintiff STP has standing to enforce the PolyGram Agreement pursuant to California Civil Code § 1559 because it is also an intended and direct third-party beneficiary of the PolyGram Agreement. The PolyGram Agreement was expressly made for STP's benefit because the parties to the PolyGram Agreement were aware that STP was entitled to receive a share of the revenues from the sale, license and other exploitation of the TIST soundtrack album and sound recordings pursuant to the express terms of section 6 of the 1982 Agreement. Under the PolyGram Agreement, Universal Music, through its subsidiary UMG, had an obligation to market and distribute the TIST soundtrack album, and was obligated to truthfully and accurately report such revenues for the express benefit of STP. STP, although dissolved in or about June 1986, has the right to prosecute this action against UMG and Universal Music to enforce the terms of the PolyGram Agreement and collect and distribute to its owners all revenues and royalties owed them pursuant to California Corporations Code § 2010.

105.   At all times, Plaintiffs performed their obligations under the 1982 Agreement.

106.   Defendants UMG and Universal Music have breached and are in continuing breach of their obligations under the PolyGram Agreement by, *inter alia*, engaging in anti-competitive and unfair self-dealing between Vivendi subsidiaries;

RUSS, AUGUST & KABAT

failing to keep accurate records; failing to collect applicable soundtrack revenues or properly include or report such revenues in accounting statements; failing to accurately calculate and report unit sales and returns; underreporting licensing fees, including licensing receipts from various music services, incorrectly applying royalty rates and bases, overstating the number of "free" goods, applying incorrect foreign exchange and tax withholding rates, inflating and overstating administrative expenses and other deductions from revenues, failing to diligently exploit available sound recording revenue streams; claiming undocumented and false administrative and other expenses, and misrepresenting the amount of units sold and revenues received, knowing that Canal would repeat these misstatements in Canal's own accounting statements to STP, all as part of a fraudulent scheme to deprive Plaintiffs of their contractual rights.

107.   Plaintiffs have been and continue to be damaged by Defendants' illegal acts and contractual breaches in amounts to be proven at trial.

**COUNT IV**

**Beach of the Implied Covenant of Good Faith and Fair Dealing – PolyGram Agreement**

**(Against UMG and Universal Music)**

108.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 107 above, as if fully set forth herein.

109.   The PolyGram Agreement contains an implied covenant of good faith and fair dealing. Defendants UMG and Universal Music breached this implied covenant by their acts, including the anti-competitive and unfair business practices among themselves and Vivendi as alleged herein.

110.   Defendants UMG and Universal Music have intentionally abused their power to frustrate Plaintiffs' right to receive the benefit of the bargain made for Plaintiffs' express benefit under the PolyGram Agreement, in a manner that goes beyond mere breach of their express contractual obligations under PolyGram

34

RUSS, AUGUST & KABAT

Agreement, but as part of an intentional scheme abusing Defendants' discretionary power to deprive Plaintiffs of the benefits contemplated in the PolyGram Agreement, and, in turn, the 1982 Agreement.

111.   Plaintiffs have been damaged by Defendants' wrongful conduct in amounts to be proven at trial.

**COUNT V**

**Fraud by Concealment and Misrepresentation**

**(Against All Defendants)**

112.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 111 above, as if fully set forth herein.

113.   Since acquiring all pertinent rights in *This Is Spinal Tap*, Defendants Vivendi and Canal, by and through their agents Ron Halpern, Barbara DiNallo and others, have issued periodic profit participation statements to Spinal Tap Productions c/o CAA, representing to Plaintiffs that the gross receipts, expenses and net profits identified therein (including those revenues and royalties reported by UMG) were truthful and accurate.

114.   Despite repeated requests made by Plaintiffs' agents from approximately 2009 to 2012, Defendants have failed to deliver to Plaintiffs numerous accounting statements, with gaps for years that would have significantly enhanced revenue, intentionally concealing material facts regarding the actual gross receipts, expenses and profits owed to Plaintiffs, namely any statements prior to 1989, statements from October 1, 1992 to December 31, 1993 and July 1, 1994 to December 31, 1994, and statements for the years 2000 to 2001, 2003 to 2005, and 2014.  In the accounting statements that Defendants did deliver to Plaintiffs, Defendants intentionally concealed and/or omitted material facts that were known only to Defendants and that Plaintiffs could not have reasonably discovered.

115.   Examples of Defendants' intentional concealment of material facts in the accounting statements, which were only discovered as a result of the 2013 study

35

commissioned by CPP, include but are not limited to:

- failure to account for monies received, including a 2004 settlement payment received from MGM Home Video totaling over $1.6 million dollars for underreported VHS and DVD revenues, when statements for the year 2004 were never submitted to Plaintiffs by Defendants;

- failure to account for and/or collect monies from exploitation of the soundtrack music rights claimed and administered by the Universal Music Group, which has reported a mere $98 (ninety-eight) dollars in gross receipts from music sales from 1989 to 2017;

- improper expense deductions, including undocumented expenses for "Prints" and "Advertising & Publicity" allegedly totaling over $3.3 million;

- undocumented charges to "Freight and other Direct Costs" totaling $1,01,427 dollars, with over $600,000 allegedly incurred from 2007 to 2017, more than *twenty* years after the film's initial release, and nearly $100,000 incurred from 2014 to 2016;

- failure to account for monies under the terms of the 1982 Agreement as "actually received by Embassy in the United States";

- failure to account for and/or collect revenue on merchandise and for use of material protected by *Spinal Tap* trademarks and copyright; and

- omission of material information concerning Vivendi's self-dealing and wrongful sharing of revenues from different Vivendi subsidiaries, including the improper and disproportionate allocation of costs and bundling and cross-collateralization of unsuccessful films in the Embassy catalogue.

116. Defendants at all times had an affirmative duty to disclose to Plaintiffs all material facts concerning the actual gross receipts collected, expenses incurred, and profits owed to Plaintiffs because Defendants possessed exclusive knowledge of all material facts which were not known nor readily available to Plaintiffs and actively concealed those material facts from Plaintiffs, and because Defendants made partial representations of facts to Plaintiffs but intentionally failed to disclose other material facts making the accounting statements materially misleading and deceptive. Defendants intentionally concealed these and other material facts from Plaintiffs with the intent to deceive and defraud Plaintiffs.

RUSS, AUGUST & KABAT

36

RUSS, AUGUST & KABAT

117.   Defendants also affirmatively represented that the accounting statements were truthful and accurate, both through affirmative representations made by Vivendi's agents, including Ron Halpern, and through Defendants' continued delivery of cumulative accounting statements without correction or amendment by their agent Barbara DiNallo.  Defendants through their agents further affirmatively represented that they were using all available means to promote *Spinal Tap* assets and enforce *Spinal Tap* intellectual property to maximize revenue for the creators. Examples of these affirmative representations include, but are not limited to:

- Ron Halpern, during a telephone call on September 23, 2004, concerning a major discrepancy with MGM Home Video's reporting to Canal of *This Is Spinal Tap* DVD and VHS sales, assured Plaintiffs' then-manager Harriet Sternberg that he would speak with Canal's Senior Vice President and CFO, Robert Chamberlain, and promised that he would support the co-creators efforts to get any revenue they deserved.  Ms. Sternberg was later informed in a letter dated December 16, 2004 that the auditor hired by Canal was unable to confirm that MGM reported the video sales properly and recommended that Ms. Sternberg discuss the matter with MGM. It wasn't until after CPP received the report it commissioned in 2013 that CPP and Shearer discovered that Vivendi had received a settlement payment from MGM for more than $1.6 million in 2004. That settlement payment was intentionally hidden from Plaintiffs: Vivendi to this day has failed to provide an accounting statement for the year 2004, and the $1.6 million settlement does not appear on any of the other accounting statements provided to Plaintiffs.

- Ron Halpern, from approximately September 2008 through 2009 assured Plaintiffs' then-attorney, Barry Tyerman, that the accounting was accurate, that Halpern and his staff at Canal had not "ripped off" the co-creators, and that Canal was going "above and beyond" their contractual duties to the co-creators.

- Barbara DiNallo from approximately July 2011 to June 2017 sent periodic accounting statements to STP c/o CAA and to Harry Shearer's business managers at the firm Power & Twersky in response to formal requests for all accounting statements related to *This Is Spinal Tap*.  Defendants represented, by each of the accounting statements that Ms. DiNallo delivered to Plaintiffs after being put on notice of Power & Twersky's formal demands for complete accounting statements, that the accounting statements provided were accurate and truthful.

37

- Barbara DiNallo among others at StudioCanal, from approximately 2011 through 2016, told Power & Twersky that StudioCanal was aware of unlicensed products and unauthorized use of *Spinal Tap* intellectual property, and Justine Francke from Canal's Legal and Business Affairs office stated in an email dated April 4, 2014: "Please be sure that STUDIOCANAL is totally committed to defending its right holders' interests."

- Defendants affirmatively misrepresented, through the accounting statements that Canal delivered to STP, that there were no new sound recording, music publishing, or merchandising revenues attributable to TIST for years.

118. As alleged hereinabove, UMG and Universal Music have also made affirmative misrepresentations regarding the sound recording units sold, revenues collected and expenses incurred, and concealed material information regarding their self-dealing and improper accounting methods, through the false and misleading accounting statements they provided to Canal, and in other communications that representatives of UMG and Universal Music had with Mr. Halpern in connection with TIST. The details of the communications between representatives of Universal Music Group and Canal/Vivendi are presently within the exclusive knowledge of Defendants, and will be the subject of discovery in this action. UMG and Universal Music knew, or had reason to know, that their misrepresentations and concealment of material facts regarding the soundtrack revenues and related fraudulent accountings (and in particular the false statements included in UMG's accounting statements issued to Canal) would be repeated directly by Canal to Plaintiffs in the accounting statements Canal provided to STP, and in communications from Mr. Halpern to Plaintiffs' representatives regarding the soundtrack accountings. UMG and Universal Music intended that Plaintiffs would rely on the fraudulent statements and concealment they knew, or had reason to know, would be repeated to Plaintiffs, in order to deprive Plaintiffs of their proper share of the soundtrack revenues and royalties, and to prevent Plaintiffs from discovering the true facts regarding the soundtrack accountings prepared for Plaintiffs' express benefit.

RUSS, AUGUST & KABAT

119.   All of these representations were knowingly false when made and/or were made recklessly and without regard for their truth in derogation of Defendants' and their agents' duty to review and confirm the completeness and accuracy of the accounting statements before conveying to Plaintiffs (or, in UMG's and Universal Music's case, knowing that it would be conveyed to Plaintiffs) that they were accurate and truthful.  These representations were made by Defendants with the intent that Plaintiffs rely on them, and foreseeably would be harmed by them. Plaintiffs reasonably relied on these representations to their detriment.

120.   These representations were made by and on behalf of Vivendi, Canal, and Universal Music Group, which are all responsible for exploitation of pertinent *Spinal Tap* rights and for accounting under the 1982 Agreement or, as applicable, the PolyGram Agreement.  Defendants knowingly made these false statements, and concealed material facts, in order to keep the profits derived from TIST and the associated music within the Vivendi conglomerate rather than share them with Plaintiffs as required by law and contract.

121.   As a direct result of Defendants' intentional misrepresentations and active concealment of material facts, Plaintiffs were unaware of the true facts. CPP and Shearer did not discover Defendants' fraudulent accounting practices until approximately November 2013, and the other plaintiffs did not discover the bases for their claims until after the initial complaint in this lawsuit was filed on October 17, 2016.  Had Defendants disclosed to Plaintiffs the concealed material facts, Plaintiffs would have acted differently, including by, without limitation, shifting control of the exploitation of these assets away from Vivendi many years earlier and by seeking to recover and enforce trademarks and other intellectual property rights many years earlier, Plaintiffs would also have avoided the expense of commissioning a study to discover Vivendi's fraud.

122.   As a direct result of Defendants' intentional misrepresentations and active concealment of material facts, Plaintiffs have been harmed and have suffered

RUSS, AUGUST & KABAT

damages in amounts to be proven at trial.  The damages suffered by Plaintiffs as a result of Defendants' fraud are different from and in addition to those suffered under their breach of contract claims, including but not limited to the out-of-pocket expenses incurred to commission the 2013 study to discover Defendants' fraud, the lost time-value of money and interest on the monies wrongfully withheld from Plaintiffs, and punitive damages to punish and deter future fraudulent conduct both in this action and in the entertainment industry at large.

123.   Defendants' conduct was willful, wanton and oppressive, and designed maliciously to steal from, deceive and injure Plaintiffs.  Plaintiffs are entitled to an award of punitive damages to punish and deter this conduct.

**COUNT VI**

**For an Accounting**

**(Against All Defendants)**

124.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 123 above, as if fully set forth herein.

125.   Defendants were obligated to provide to Plaintiffs statements accurately reflecting the amount of revenues derived from the distribution and exploitation of *This Is Spinal Tap* and associated music, sound recordings, merchandise and other rights, and to remit to Plaintiffs their share of revenues.  In the case of UMG and Universal Music, such parties were obligated to provide accurate accountings that they knew would be provided directly by Canal to Plaintiffs.

126.   Despite demand therefor, Defendants have failed and refused, and continue to fail and refuse, to provide Plaintiffs with proper and accurate accountings reflecting the amount of revenues derived from the distribution and exploitation of *This Is Spinal Tap* and associated music, sound recording merchandise and other rights.  Instead, Defendants have intentionally provided false and fraudulent profit participation statements to Plaintiffs.

127.   The false and fraudulent profit participation statements submitted by

RUSS, AUGUST & KABAT

Defendants are cumulative, and entitle Plaintiffs to an accurate and truthful accounting showing how the current cumulative numbers were calculated.

128.   Plaintiffs are entitled to an order requiring Defendants to provide their complete books and records of account in all details.

## COUNT VII

### Declaratory Judgment of Trademark Rights, 28 U.S.C. § 2201, *et seq.*
### (Against Vivendi and Canal)

129.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 128 above, as if fully set forth herein.

130.   In 1984, Defendants' predecessor-in-interest Embassy filed a trademark application with the United States Patent and Trademark Office (USPTO) for the mark SPINAL TAP in connection with entertainment services rendered by a musical group.  The federal registration for that mark (Registration No. 1311537) was cancelled by the USPTO in 1991 as shown in Exhibit 1 hereto.

131.   In early 2000, Defendants' predecessor-in-interest, Canal + D.A., a Vivendi subsidiary, filed certain trademark applications with the USPTO for the mark SPINAL TAP in connection with, *inter alia,* entertainment services in the nature of live musical performances by a group, videotape and film production of live musical performances, and certain merchandising associated with the mark as shown in Exhibit 1 hereto.

132.   In or about March 2002, Canal + D.A. filed an instrument with the USPTO stating that it had merged with StudioCanal Image, a French joint stock company and Vivendi subsidiary, and that it was conveying its rights to the applications and registrations for the SPINAL TAP marks to StudioCanal Image, as shown in Exhibit 2 hereto.  StudioCanal Image, which subsequently merged into Canal, is identified by the USPTO as the last listed owner for federal registrations for those SPINAL TAP marks, now cancelled, Registration Nos. 2499728, 2463576, 2867023, 2881983 and 2881984.

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

RUSS, AUGUST & KABAT

133.   Defendants subsequently abandoned the SPINAL TAP marks, resulting in the USPTO's cancellation of the federal registrations for those SPINAL TAP marks in 2011 and 2012 as shown in Exhibit 1 hereto.  Defendants' abandonment of the SPINAL TAP marks is reflected by their discontinuation of use or enforcement of the marks in the ordinary course of trade for at least three consecutive years without intent to resume use.

134.   Defendants' abandonment is further evidenced by the fact that Defendants did not oppose an application filed on December 27, 2013 by Heretic Brewing Company to register the mark SPINAL TAP for use in connection with "beer" products, which mark was registered by the USPTO on April 7, 2015 (Registration No. 4717603) as shown in Exhibit 3 hereto.

135.   Despite Defendants' abandonment of any trademarks rights related to *This Is Spinal Tap,* including in and to the mark SPINAL TAP, Defendants have sought selectively to claim rights to the marks against Plaintiffs, and have sought to prevent Plaintiffs from performing or selling merchandise in association with the mark SPINAL TAP unless Defendants grant a license and receive payment for such use.

136.   CPP, rejecting Defendants' claim of rights, has filed on behalf of each of the four co-creators applications with the USPTO for federal registration of the mark SPINAL TAP – which have been assigned serial numbers 87203893 and 87203921 – for, *inter alia,* entertainment services in the nature of live music concerts and dramatic, comedic and musical performances and for certain merchandise as set forth in Exhibits 4 through 5 hereto.

137.   A substantial controversy exists between the parties as to whether Plaintiff CPP has the right to use and register the trademark SPINAL TAP in connection with entertainment performances and merchandise.  The controversy has sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A judicial declaration is necessary and appropriate at this time in order that Plaintiff

CPP and the four co-creators may ascertain their rights and duties with respect to the mark SPINAL TAP.

138.   Plaintiffs seek declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, confirming that their use of the SPINAL TAP marks in connection with the services and goods set forth in CPP's trademark applications does not infringe any abandoned trademark rights of Defendants.

### COUNT VIII

### Declaratory Judgment of Copyright Reversion, 17 U.S.C. § 203
### (Against Vivendi, Canal, and Universal Music Group)

139.   Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 138 above, as if fully set forth herein.

140.   Section 203 of the 1976 Copyright Act gives an author (or authors of a joint work) the right to terminate the grant of a copyright in a work executed on or after January 1, 1978.  This termination right can be exercised at any time during a five-year period beginning 35 years after the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of the sooner of (i) 40 years from the date of execution of the grant or (ii) 35 years from the date of publication of the work under the grant.  17 U.S.C. § 203(a)(3). Termination of the grant may be effected "notwithstanding any agreement to the contrary."  *Id.* § 203(a)(5).  The termination is effected by serving an advance notice in writing signed by the author or a majority of the authors who executed the grant upon the grantee or the grantee's successor in title.  *Id.* § 203(a)(4).  Upon the effective date of termination, all rights that were covered by the terminated grants revert to the author or authors subject to certain limitations. *Id.* § 203(b).

141.   Shearer, Guest, McKean and Reiner are the authors of all works associated with the *Spinal Tap* band and motion picture *This Is Spinal Tap*, and owned all copyrights in the works immediately upon their creation including but not limited to copyrights in the musical compositions, sound recordings and

RUSS, AUGUST & KABAT

characters appearing in the 20-minute film they created, and all musical compositions, sound recordings, and characters that appeared in *This Is Spinal Tap*, as well as the screenplay and the film itself (collectively, the "*Spinal Tap* Works").

142.   Pursuant to so-called "Instrument[s] of Transfer" executed as part of the May 7, 1982 Agreement with Embassy, Shearer, Guest, McKean and Reiner assigned all of their copyrights in the *Spinal Tap* Works to Spinal Tap Productions ("STP"), which STP assigned to Embassy.

143.   Defendants Vivendi, Canal, and Universal Music Group, among others, are successors-in-interest to Embassy's rights under the May 7, 1982 Agreement, including the copyrights in the *Spinal Tap* Works assigned to Embassy.

144.   In October and November 2016, Shearer, Guest, McKean, and Reiner served on Defendants and others and recorded in the U.S. Copyright Office copyright termination notices pursuant to Section 203 of the Copyright Act of 1976 to recapture all of their copyrights in the *Spinal Tap* Works.  The termination notices, copies of which are attached as Exhibits 6 through 9 hereto, have effective dates starting March 2, 2019.

145.   A substantial controversy exists between the parties with respect to the validity and legal effect of the copyright termination notices.  Vivendi and Canal, in their February 28, 2017 motion to dismiss filed with this Court, have asserted that the creators' works constituted "works for hire" which "are not eligible for termination under Section 203" and threatened to file a counterclaim against Shearer for declaratory relief to confirm that the creators have no termination rights. [Doc. # 24 at 3:4-18.]  Vivendi and Canal further asserted in the motion to dismiss that the artists' filing of the copyright termination notices has placed a "cloud" over "the movie and music copyrights" to *This Is Spinal Tap,* and that this "cloud" allegedly has already damaged "StudioCanal's ability to distribute *Spinal Tap* and to otherwise enjoy its lawful rights to the movie."  [Id.]  Plaintiffs are informed and believe that Vivendi's claim of damages is also asserted on behalf of its subsidiary,

RUSS, AUGUST & KABAT

Universal Music Group, and that both entities intend to challenge the termination notices for the sound recordings from *This Is Spinal Tap*.

146.   The controversy has sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  A judicial declaration is necessary and appropriate at this time in order that Shearer, Guest, McKean, and Reiner may ascertain their rights and duties with respect to the copyrights and ensure that they can rely on quiet, unclouded title to their copyright interests.

147.   Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, confirming the validity and effectiveness of the copyright termination notices and that the exercise of their termination rights does not represent a breach of any rights asserted by Defendants.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

(a)    Compelling Defendants to produce the original books and records of account and to satisfactorily and accurately account to Plaintiffs with respect to all expenses and revenues for the film *This Is Spinal Tap*, including associated music, merchandise and other revenues, and to disgorge the monies due to Plaintiffs therefrom;

(b)    Declaring that Plaintiff CPP's registration and use of the SPINAL TAP mark in connection with the goods and services set forth in its trademark applications do not infringe on any abandoned trademark rights of Defendants;

(c)    Declaring that the copyright termination notices served on Defendants and recorded in the U.S. Copyright Office by Shearer, Guest, McKean and Reiner are valid and effective as of the termination dates set forth in the termination notices and do not infringe on any copyrights claimed by Defendants.

(d)    Awarding Plaintiffs the following:

(i)    Compensatory and punitive damages in amounts to be determined at trial;

RUSS, AUGUST & KABAT

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1       (ii) Costs of suit;

2       (iii) Reasonable attorneys' fees;

3       (iv) Pre- and Post-Judgment Interest as allowed by law.

4      (e) Granting such other and further relief as the Court deems just and

5    proper.

6    **JURY DEMAND**

7      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs

8    demand a trial by jury on all issues triable by right to a jury.

9

10

11   DATED:  September 18, 2018   **RUSS AUGUST & KABAT**

12

13           */s/ Stanton L. Stein*

        Stanton L. Stein

14

15           Attorneys for Plaintiffs
        Century of Progress Productions,

16           Christopher Guest, Rob Reiner
        Productions, United Heathen,

17           Spinal Tap Productions, Harry Shearer,
        Rob Reiner, and Michael McKean

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

# CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2018, I electronically filed a true and correct copy of the foregoing **THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** through the Court's CM/ECF system, which will send a notice of electronic filing to all interested parties in the action through their counsel of record as follows:

Robert M. Schwartz, Esq.
Victor Jih, Esq.
Matthew O. Kussman
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
rschwartz@irell.com
vjih@irell.com
mkussman@irell.com
Attorneys for Defendants
Vivendi S.A.; StudioCanal;
and Ron Halpern

Glenn D. Pomerantz
Anjan Choudhury
Grant R. Arnow
MUNGER TOLLES AND OLSON, LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90067
glenn.powerantz@mto.com
anjan.choudhury@mto.com
grant.arnow@mto.com
Attorneys for Defendants Universal Music Group, Inc. and UMG Recordings, Inc.


 /s/ Kieanna Jolaei
Kieanna Jolaei